302 F.2d 908
 112 U.S.App.D.C. 323
 GENERAL DRIVERS AND HELPERS UNION, LOCAL 662 Affiliated with
the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Rice Lake
Creamery Company, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
RICE LAKE CREAMERY COMPANY, Respondent.
 Nos. 16470, 16505.
 United States Court of Appeals District of Columbia Circuit.
 Argued Feb. 5, 1962.
Decided May 3, 1962.
 
 Mr. David Leo Uelmen, Milwaukee, Wis., for petitioner in No. 16470.
 Mrs. Nancy M. Sherman, Attorney, National Labor Relations Board, with whom Messrs. Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Samuel M. Singer, Attorney, National Labor Relations Board, were on the brief, for petitioner in No. 16505 and respondent in No. 16470.
 Mr. O. S. Hoebreckx, Milwaukee, Wis., for intervenor in No. 16470 and respondent in No. 16505.
 Before EDGERTON, BAZELON and FAHY, Circuit Judges.
 EDGERTON, Circuit Judge.
 
 
 1
 On June 28, 1961 the Board ordered the Rice Lake Creamery Company to cease and desist from certain practices, bargain collectively with the Union, offer reinstatement to certain employees, and compensate them for loss of pay. 131 NLRB No. 161. The Board seeks enforcement of its order. The Union seeks review of the Board's failure to find that a collective bargaining agreement which was made between the Union and a group of dairies bound the Company.
 
 
 2
 In 1952 the Board had certified the Union as exclusive bargaining representative of a unit consisting of the Company's production and maintenance employees. The Company and the Union afterwards entered into a series of collective bargaining agreements, the last of which expired May 31, 1958. In March 1958 the Union notified the Company that it wished to negotiate a new agreement and served similar notice on other dairies in the area. The Company and these other dairies are referred to as 'the Group'.
 
 
 3
 On April 14, 1958 the Union asked all members of the Group to engage in joint negotiations. The Board found that the Company authorized a Group Committee to negotiate for it except in respect to certain specified matters, but that both sides bargained throughout on the premise that their negotiators had limited authority; that any agreement must be submitted to the principals, including the Company, for ratification; and that thereafter the Union would still have to negotiate some matters individually with some employers, including the Company.
 
 
 4
 Between May 8 and June 19, 1958 the Group Committee and the Union held a number of negotiating sessions but did not reach an agreement. On June 19 the Group Committee refused to negotiate further and the Union called a strike against the Turtle Lake dairy, one member of the Group. On June 20 and 21 it called strikes against two of the other members. On the evening of June 20, after a meeting at Turtle Lake, the Group Committee told the Union through a mediator that it would talk further with the Union if the strikers returned to work.[1] They refused. On June 22 the Union began its strike against the respondent Company.
 
 
 5
 The Board correctly found that the 'refusal of Respondent through its negotiators to meet with the Union unless and until it ended the (Turtle Lake) strike was a clear refusal to bargain in violation of Section 8(a)(5) of the Act.' The Act makes an unlawful refusal to bargain 'an unfair labor practive'. The Board also found that 'Since the Group negotiators did not resume face-to-face bargaining with the Union until June 24th, it is clear that the * * * unlawful refusal to meet continued at least until that date and was a direct cause of the strikes at the other three plants. Hence * * * the strike at Respondent's plant on June 22nd was an unfair labor practice strike from the outset.'
 
 
 6
 The National Labor Relations Act as amended provides that if the Board finds that a 'person named in the complaint has engaged in or is engaging in any * * * unfair labor practice', the Board shall require 'such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act.' 29 U.S.C.A. 160(c). Whether a causal connection between the unfair labor practice and the strike is or is not necessary, we think the record supports the Board's finding that there was a causal connection.
 
 
 7
 The time sequence itself supports the finding. The Union had negotiated with the Group for several weeks without calling strikes. When the Group refused to negotiate, strikes were promptly called. It is reasonable to infer from this that there was a causal connection, and not a mere accidental coincidence, between the refusals and the strikes. Testimony of Union officers points in the same direction. Mr. Veleke, secretary-treasurer of the Union, testified: 'we called a strike at Turtle Lake because we could not negotiate a new contract at that time with the committee, we couldn't reach an agreement. Q. * * * Now, isn't it a fact that at the time the strike started at Turtle Lake that you and the union management committee were in meeting at Menomonie that same day? A. Well, you can say we were in Menomonie; as far as in meeting, we asked the conciliator several times to bring them and they refused to come in to talk.' Mr. Burger, a business agent of the union, was asked: 'So the conduct of the negotiations on the morning of June 19 had nothing to do with the strike on June 19 as far as the employees were concerned?' He relied: 'Yes, it did.' Mr. Novacek, the president of the union, testified: '* * * during the afternoon of the 19th when the company or the negotiating committee for the employees (employers) refused to come in the room we sat there, the four or five of us, and discussed the situation and we decided to strike Turtle Lake * * *.'
 
 
 8
 On Saturday, June 21, Mr. Veleke went to Rice Lake. At the Board hearing counsel for the Company said to him: 'But your previous custom was to make prior arrangements for negotiations?' He replied: 'Yes. When there was not any labor dispute and when negotiations were progressing on a normal basis where people were talking, yes. But when people weren't talking, why, you are kind of confused as to what to do, because you won't get no agreement when people won't talk to you.' The Company's unlawful refusal on June 20, through the Group, to resume bargaining while strikes were going on, had not been withdrawn when the strike against the respondent Company began on June 22.
 
 
 9
 No doubt the Company's refusal to bargain was not the only cause of the strike. There was evidence that its refusal to stop handling Turtle Lake milk was one cause. But if an unfair labor practice had anything to do with causing the strike, it was an unfair labor practice strike. National Labor Relations Board v. Stackpole Carbon Co., 3d Cir., 105 F.2d 167, 176, cert. denied, 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506. National Labor Relations Board v. Birmingham Publishing Co., 5th Cir., 262 F.2d 2.
 
 
 10
 Moreover the Board found that after the strike began, the Company failed to bargain in good faith and committed other unfair labor practices which prevented agreement and prolonged the strike. 'It should be noted that even where a strike which initially involved no unfair labor practice is prolonged or aggravated by an employer's unfair labor practice, the same rule applies as where the strike is the result of an unfair labor practice, and the employer is bound to reinstate all strikers and discharge all those hired to replace them during the strike.' National Labor Relations Board v. Remington Rand, Inc., 2d Cir., 130 F.2d 919, 929, fn. 8. 'There is no question but that where a strike is initially undertaken for economic reasons but is prolonged by reason of the employer's intervening unfair labor practices, the employer is in the same position he would have been in had his unfair labor practice caused the strike in the first place * * *.' National Labor Relations Board v. Crosby Chemicals, Inc., 5th Cir., 188 F.2d 91, 95.[2]
 
 
 11
 The Company contends it 'was denied due process of law by the Board's action in finding unfair labor practices based on matters which were not presented for trial or litigated at the hearing, and by predicating its order thereon.' We find no denial of due process. The chief though not the only contention of the Company under this head is that the Board should not have considered the June 20, incident at Turtle Lake because it was not referred to in the Board's Complaint and Notice of Hearing and because, at the outset of the hearing, 'there was no reference by anyone to any claim of an unfair labor practice on June 20 at Turtle Lake which caused the strike at Respondent's plant on June 22.' But the Complaint and Notice of Hearing charged that the Company 'has been engaging in and is engaging in unfair labor practices * * *. Beginning on or about May 8, 1958, and at all times thereafter, the Respondent has failed and refused, and continues to fail and refuse, to bargain collectively with the Union as the exclusive colective bargaining representative of all the employees of the Unit, in that inter alia it: a. Entered into negotiations with the Union on or about May 8, 1958, with a fixed intention and determination not to arrive at a collective bargaining agreement, and throughout the course of subsequent negotiations engaged in conduct calculated to accomplish that result.' The incident at Turtle Lake on June 20 was conduct calculated to accomplish that result and was therefore within the scope of the complaint. The Board was not obliged to plead its evidence.[3]
 
 
 12
 We think it unnecessary to discuss the Company's other contentions and the Union's contentions. We find that the Board's order rests on findings supported by substantial evidence and is in accordance with law. The order will be enforced.
 
 
 13
 Order enforced.
 
 
 
 [1]
 The Union's representative Veleke testified that mediator Anderson told him the Group negotiator 'had notified Mr. Anderson to tell us that if the men went back to work they would talk'; and again, 'They said they talked if the men went back to wrok.' The Company now objects to this testimony as hearsay, but the Board has more latitude than a court in admitting testimony and the Company did not object to this testimony when it was given
 The Company included in its exceptions to the Trial Examiner's report which the Board adopted the 'finding * * * relative to the alleged negotiations meeting at Turtle Lake on June 20.'
 
 
 [2]
 Cf. Warehousemen and Mail Order Employees, Local No. 743, Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board, 112 U.S.App.D.C. , 302 F.2d 865, decided Jan. 23, 1962
 
 
 [3]
 The Company's brief in this court concedes that 'the General Counsel in the three briefs filed with the Trial Examiner made a passing reference to the June 20 incident at Turtle Lake.'