**GENERAL TEAMSTERS AND ALLIED WORKERS LOCAL UNION NO. 992, Affiliated With The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Pennsylvania Glass Sand Corporation, Intervenor.

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PENNSYLVANIA GLASS SAND CORPORATION, Respondent,**

Teamsters Local Union No. 992, Intervenor.

**Nos. 22072, 22762.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1969.

Decided April 7, 1970.

Mr. Hugh J. Beins, with whom Mr. Robert M. Baptiste, Washington, D. C., was on the brief, for petitioner in No. 22,072 and intervenor in No. 22,762.

Mr. Roger Sabo, Atty., National Labor Relations Board, for respondent in No. 22,072 and petitioner in No. 22,762.

Messrs. Arnold Ordman, General Counsel, National Labor Relations Board, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Glen M. Bendixsen, Atty., National Labor Relations Board, were on the brief for respondent in No. 22,072 and petitioner in No. 22,762.

Mr. Robert Lewis, New York City, for respondent in No. 22,762 and intervenor in No. 22,072.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

These cases involve a petition by the National Labor Relations Board for enforcement of its order against the Pennsylvania Glass Sand Corporation ("the Company"), and a petition by the General Teamsters and Allied Workers Local 992 ("the Union") for review of that order. The Company attacks several of the findings made by the Board and the

Union seeks remedies beyond those provided by the Board.[1]

## I

The Company is engaged in the business of mining and distributing industrial sand. Its operations are carried out in several plants, including one in Berkeley Springs, West Virginia, the critical site of the events before us, two in Pennsylvania, and one in New Jersey. On March 3, 1967, the Union was selected by the Berkeley Springs production and maintenance employees in a Board-conducted election. The Company filed four objections to the election, three of which the regional director overruled and one of which he recommended for hearing. The fourth objection was eventually overruled, but only after the important events in this case. The Union was thereafter certified.

Meanwhile, in February of 1967, another union, the Glass Bottle Blowers Association (GBBA), which represents production and maintenance employees at the Company's Pennsylvania plants, had begun negotiating a contract with the Company. On March 31 the GBBA rejected a Company offer which included a 14-cent-per-hour wage increase, and an impasse was reached. A strike by GBBA employees began the next morning at the Pennsylvania plants.

On April 17, GBBA pickets from the Pennsylvania plants appeared at the New Jersey and Berkeley Springs plants. Those Berkeley Springs, employees who were represented by a GBBA local (construction and repair workers) immediately joined the Pennsylvania pickets. Somewhat later the same day, the petitioner Union (Teamsters) asked its members (production and maintenance workers) to honor the GBBA picket line. By April 24, all of the members of the Union were on strike at the Berkeley Springs plant.

Three Company activities during this period form the major factual premises of the cases before us. One was the general pattern of Company threats and interrogation preceding and during the events already described. The Company, while not admitting to them, concedes that the findings of the Board that such incidents took place are supported by substantial evidence. We thus accept them as valid. Oil, Chemical, and Atomic Workers Local 4–243, A.F.L.–C.I.O. v. NLRB, 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966). Another significant act of the Company was the 14-cent wage increase which it granted to all production and maintenance workers, Union and non-Union members alike, on April 21. At about the same time it determined, in what is a final focus of dispute in this case, to hire replacement employees at the hourly rate of $2.135 per hour, a rate which included the 14-cent increase.[2] On May 3, the Union filed its original unfair labor practice charge with the Board.[3]

On May 11, a Friday, the GBBA settled with the Company at the Pennsylvania plants and picketing at the Berkeley Springs plant by the GBBA workers ceased. The Company took all of the striking GBBA workers back immediately. On May 15, the following Tuesday, striking members of the Union sought reinstatement.[4] They were informed that their jobs had been filled by others (except for two, who were reinstated). Picketing by the Union continued until May 22, eleven days after the end of the GBBA strike.

On May 25, 1967, the Board issued its complaint against the Company. A

1. The Board's Decision and Order are reported at 172 NLRB No. 54.

2. The complaint as issued by the Board did not allege that the hiring of replacement employees at a higher rate than that previously prevailing constituted an unfair labor practice.

3. It filed amendments to the charges on May 17 and July 12.

4. A few sought reinstatement earlier; one obtained it and two were given work as "new hires."

Trial Examiner subsequently conducted hearings and issued her decision the following December. She found that the Company had violated sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act.[5] She concluded that the strike had begun as an economic strike, but that it had been converted to an unfair labor practice strike on April 21 by the Company's unilateral 14-cent wage increase. Accordingly, she found that the Company was obligated to reinstate the striking workers with back pay from the date of their application to return to work. She also made findings that the Company had engaged in numerous and widespread unfair labor practices involving threats to workers, giving the impression of surveillance, etc., and recommended a cease and desist order forbidding such activities. In addition, her proposed order included provisions affirmatively requiring bargaining with the Union and requiring the posting of a notice in the Berkeley Springs and other plants pledging the Company not to take part in various objectionable activities.

With minor modifications not here relevant, the Board adopted the Trial Examiner's findings, conclusions, and recommended order.

We begin our consideration of the merits by sketching the major contentions of the Company and the Union. The Company argues that the strike by the Union, which the Board agrees began as an economic strike, was not converted to an unfair labor practice strike

by the 14-cent wage increase. It further contends that the Board based part of its determination that the economic strike had been converted to an unfair labor practice strike on a finding that replacements for the strikers had been hired at higher wage rates, and that this latter allegation had never been charged or properly litigated before the Trial Examiner or the Board.

The Union argues that the Board erred in failing to find that the strike was an unfair labor practice strike from its inception, and that back pay should run from the beginning of the strike.[6] The Union also claims that even assuming that the strike became an unfair labor practice strike only as of April 21, as the Board found, back pay should be awarded from the point at which the nature of the strike changed, and not from the later date (May 15) on which the striking workers unsuccessfully sought reinstatement.

A. *Conversion of the Economic Strike into an Unfair Labor Practice Strike*

■ There is substantial evidence supporting the Trial Examiner's and Board's finding that the 14-cent wage increase converted an economic strike into an unfair labor practice strike.

Company officials testified that the wage increase was motivated by a feeling of fairness toward the workers. The Company's notice stated that "as a matter of practice" it had put into ef-

---

5. 29 U.S.C. §§ 158(a) (1), 158(a) (3) (1964).

6. The Union also argues in support of this conclusion on the alternative ground that the Company had unlawfully discharged employees as soon as they went on strike and prior to any replacement. This ground was adopted as an alternative basis for the order by the Trial Examiner, who relied on the Company's April 17 letter that any employee failing to report for work (*i. e.*, in the sympathy strike with the GBBA) would be deemed to have quit, its April 28 advice to each striking employee that his group insur-

ance had been terminated, and the Company's failure to retract the April 17 statement by any request to the strikers to return for work. The Board expressly stated (see its footnote 3) that in view of the conclusion that the strike had been converted to an unfair labor practice strike before any replacements were hired, it deemed it unnecessary to, and did not, pass on or adopt the Examiner's further conclusion that the strikers would be entitled to reinstatement even if the strike had remained purely economic. We likewise have no occasion to consider this Union contention.

fect "increases negotiated" by the GBBA for the Pennsylvania plants. It recognized that no increase had yet been instituted for the Pennsylvania plants, but noted that the Company had proposed a 14-cent increase as part of a three year contract. "In view of all this, the Company does not believe employees of the Berkeley Works should suffer or be penalized because of what had occurred elsewhere. Therefore, we are putting into effect the hourly rate increase we have offered [at the Pennsylvania plants] in the belief it is fair, substantial, and in line with what other companies are doing."

The Trial Examiner and the Board found that the real motive for the wage increase was to convince the Union members, before a possible second election, that they didn't need the Union in order to obtain the benefits of collective bargaining. The Company's claim of justification of the increase by virtue of a practice of linkage to the Pennsylvania plants was held not established.[7] We affirm the Board's finding of the Company's intent as supported by substantial evidence.

We take note, as did the Examiner and the Board, of the evidence of a general background of surveillance and harassment prior to and following the election; of the fact that at the time of the wage increase the Company had some hope of overturning the election and obtaining another (its fourth objection to the election had not been overruled by the regional director but had been recommended for hearing); and of convincing evidence, despite denial by Company officials, that the Company actively publicized the wage increase on local radio and in the local newspaper, thereby aiming the news at strikers as well as nonstrikers.

■■ Although no election was actually pending, the pendency of the hearing on the Company's objection, with its attendant possibility of the holding of a second election, brings the case under the rule of N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Unilateral inducements are unlawful not only while an election is pending, but also after an election while objections are pending. Northwest Engineering Co., 148 NLRB 1136, 1145, enforced *sub nom.* United Steelworkers of America, A.F.L.–C.I.O. v. NLRB, 126 U.S.App.D.C. 215, 376 F. 2d 770, cert. denied, 389 U.S. 932 (1967). The Board's conclusion that the 14-cent wage increase was an unfair labor practice is therefore affirmed.

■ The Board concluded that the Union's strike started as an economic strike (in support of the GBBA) on April 17, and was converted to an unfair labor practice strike on April 21 by virtue of the Company's unilateral and hence unlawful wage increase, and its program to hire replacements on the basis of a higher wage rate than that paid its employees prior to the strike. There is ample evidence to support this conclusion.

On Saturday morning, April 22, after learning of the 14-cent wage increase announced and publicized the previous evening, the Union's business agent arranged for a Union meeting to be held Sunday afternoon, April 23, and had the meeting publicized by spot announcements. About 60–65 members attended.

7. In addition the Examiner noted, inter alia, the concession of Company officials that wage rates at the plants were not identical, that the Company did not put into effect at Berkeley Springs fringe benefits negotiated for the Pennsylvania plants, that, *e. g.*, Sunday work was at double time in the contract negotiated with GBBA and only time and a half at Berkeley Springs. The Board's counsel on appeal stresses that the Company did not in fact offer to extend to West Virginia the wage increase (more than 14-cents) agreed with GBBA for Pennsylvania. While not decisive, in and of themselves, these matters are not irrelevant.

They were very much disturbed by the Company's unilateral announcement, and some 25 to 30 members made various comments about it. The president of the local was asked whether it did not constitute an unfair labor practice, and he replied it did. His motion to institute a picket line in protest was carried unanimously. Next morning in addition to the GBBA line there was a Teamsters picket line, manned by members of the Union carrying signs "PGS Unfair to Teamsters Local 992."

The Examiner and the Board concluded the evidence showed the original strike was prolonged by the wage increase. One employee, Donald Kyne, testified that once the Union picket line went up he joined it, although he had crossed the GBBA picket line. And the Examiner thought it reasonable to infer that the ten or so employees who returned to work before replacements were hired would have been greater in number, the strike having failed to achieve success, if it had not been for the unfair labor practice trying to undercut the Union which had only six weeks previous won a close election. Evidence supporting the conclusion of prolongation of the strike includes the fact that the strike did not end on May 15, when the GBBA strike ended, but continued to May 22.

The case falls under the rule of N.L.R.B. v. Remington Rand, Inc., 130 F.2d 919, 929 n. 8 (2d Cir. 1942), quoted with approval in General Drivers and Helpers Union Local 662 v. NLRB, 112 U.S.App.D.C. 323, 326, 302 F.2d 908, 911 (1962): "[W]here a strike which initially involved no unfair labor practice is prolonged or aggravated by an employer's unfair labor practice, the same rule applies as where the strike is the *result* of an unfair labor practice, and the employer is bound to reinstate all strikers * * *." (Emphasis in original.)

■ Once it is shown that an employer's unfair labor practice is a significant factor in a strike, the burden is "on the Company to show that the strike would have continued even if it had [not committed its unfair labor practice]." Philip Carey Mfg. Co. Miami Cabinet Division v. NLRB, 331 F.2d 720, 729 (6th Cir. 1964), cert. denied, International Union, United Auto, Aerospace and Agr. Implement Workers of America, U.A.W.–A.F.L.–C.I.O. v. Philip Carey Mfg. Co., Miami, Cabinet Division, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92. Even where no burden has passed to the company, there is room in this labor statute for requiring a wrongdoer to "bear the risk of uncertainty" concerning the extent of the consequences ascribable to his wrong.[8] Here the burden has passed to the company, and we cannot say as a matter of law that the observations put forward by the Company are tantamount to discharge of its burden of disentanglement.[9]

## B. *The Proper Timing of the Board's Back Pay Order*

The Union argues that the Board's back pay order should date from the beginning of the strike on April 17, or alternatively from the conversion of the strike into an unfair labor practice strike on April 21, instead of the date on which the workers requested reinstatement.

---

8. Int'l Union of Electrical Radio and Machine Workers v. NLRB [Tiidee Products, Inc.], 138 U.S.App.D.C. ——, 426 F.2d 1243, (April 3, 1970), quoting Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

9. The Company argues that the readiness of the Union members to return to work without qualification, following the GBBA settlement, establishes that the unfair labor practice was not material. Obviously an unconditional offer to return does not negative the prior condition of an unfair labor practice strike. And the fact that Union members are ready to stay out on strike while there are two reasons or grievances for striking does not mean they would have stayed out if there had been only one in being.

■ Without detailing the Union's contention it suffices to note that the traditional remedy of the Board, in the absence of special circumstances, has been to award back pay from the date that employees request reinstatement.[10] That approach has already been approved by this court,[11] and absent some showing of special circumstances,[12] or a showing that the traditional remedy is inadequate (*see, e. g.*, International Union of Electrical, Radio, and Machine Workers v. NLRB, [Tiidee Products] 138 U.S.App.D.C. ——, 426 F.2d 1243, April 3, 1970), the Board's discretion in awarding remedies will not be interfered with. Oil, Chemical and Atomic Workers Local 4–243 v. NLRB, *supra.*

### C. *The Adequate Hearing Issue*

The Board found in its opinion that "the strike * * * was economic at its inception, but was converted to an unfair labor practice strike by the Respondent's announcement of a wage increase on April 21 *and its hiring of replacements at higher rates than it paid its employees prior to the strike* * * *"* (emphasis added). And in its order, the Board requires the Company to cease and desist from "reclassifications," among other things. The nature of what the Board meant by "hiring * * * at the higher rates" and "reclassifications" is disputed. The Company claims that the words refer to its hiring of replacements at the hourly rate of $2.135 instead of a 59.5-cent-lower figure allegedly in effect as a starting salary before the strike, and that the bulk of that increase was due to a reclassification which was not attacked in the Board's complaint. The Board, in its reply brief, claims that the words are just another way of expressing the fact that the replacement workers taken on after April 21 received the same 14-cent-per-hour raise that everyone else (including strikers) did.

■ The matter takes on importance, of course, from the fact that the Board may not make findings of fact and order related remedies on issues not charged in its complaint or litigated in the subsequent hearing, especially where, as in this case, the Trial Examiner assures the charged party that matters not charged will not be the subject of findings of fact.[13] On this the Board and the Company seem to agree.

However, it seems to us plain from the face of the Board's opinion that it did not rely on the reclassification of replacements in making its finding that the strike was an unfair labor practice strike. Indeed the Board's opinion specifically states:

> In view of our adoption of the Trial Examiner's conclusion that *the strike was converted into an unfair labor practice strike before any replacements were hired,* and our conclusion that in consequence all strikers are entitled to reinstatement, we deem it unnecessary to, and do not, pass on or

10. *See, e. g.,* Food Store Employees Union Local 347 Amalgamated Meat Cutters and Butcher Workmen of North America, A.F.L.–C.I.O. v. NLRB, 135 U.S. App.D.C. 341, 418 F.2d 1177 (July 18, 1969).

11. *Id.*

12. The Board has shown flexibility in this area by making such awards in cases involving special circumstances. *See, e. g.,* J. P. Stevens & Co., Inc. v. N.L.R.B., 406 F.2d 1017 (4th Cir. 1968).

13. In view of this ruling by the Trial Examiner we need not consider to what extent the doctrine that the Board is limited by the gravamen of the complaint is qualified by the doctrine that a complaint may be amended to conform to the proof, if elementary fairness (including notice) is not violated.

The Union cites United Packinghouse, Food and Allied Workers Int. Union A.F.L.–C.I.O. v. NLRB, 135 U.S.App. D.C. 111, 416 F.2d 1126 (Feb. 7, 1969) for the proposition that a violation not specifically charged can be found if litigated. But the point there under discussion was remanded to be "more fully litigated." Here the Trial Examiner disavowed any intent to litigate the matter fully.

adopt her further conclusions \* \* \* that the strikers would be entitled to reinstatement even if the strike had remained purely economic. [Emphasis added.]

 A different disposition is required as to so much of the Board's order as requires the Company to cease and desist from (among other acts) "reclassifications." It is possible that this wording is the product of an unreflecting transposition of some master form. However in view of the issue before us we cannot disregard as captious the possibility that it was intended to refer, or may be taken to refer, to an action like the 59.5-cent reclassification not alleged in the complaint as an illegal act. We think it in the interest of justice to remand the case to the Board so that it may either withdraw the word or explain, if some other meaning was intended, its appropriateness absent a finding that the reclassification was an unlawful act. We further deem it appropriate to direct the Board to reconsider the remainder of its remedy to determine if it is attributable, in severity or content, to the apparent improper finding of reclassification.

In upholding the ultimate finding of the Board we note that the presence of the reclassification issue in this case cannot be said to have "tainted" the proceedings in any sense. Although not charged as a separate illegal act, the reclassification was relevant both to the motives of the Company in instituting the 14-cent wage increase and to the impact of the 14-cent wage increase. As such it was a matter that was properly before the Board.

Our remand is to obviate any doubt that the Board's discretion in the choice of remedy was affected by an improper finding. We do not mean to suggest that the present remedy, apart from section 1(c), cannot be supported on review by the facts properly charged, litigated, and found. We merely require that the Board exercise its discretion as to the scope of its remedy without any possible influence from a slip of the pen or other mishap.

Our conclusions both in upholding the ultimate findings and conclusions of a violation of § 8(a) (3), and in remanding for a further examination of remedy in light of a circumscribed subsidiary finding, are supported by the principles set forth in Braniff Airways, Inc. v. C. A. B., 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967) ; N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir. 1953), cert. denied, 346 U. S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953).

Remanded for proceeding consistent with this opinion.