PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DORSEY TRAILERS, INCORPORATED,
                              *Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
                              *Respondent,*

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; LOCAL 1868,
UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
                              *Intervenors.*

No. 99-1390

NATIONAL LABOR RELATIONS BOARD,
                              *Petitioner,*

v.

DORSEY TRAILERS, INCORPORATED,
                              *Respondent,*

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; LOCAL 1868,
UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,
                              *Intervenors.*

No. 99-1561

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
(4-CA-23996, 4-CA-24049, 4-CA-24356, 4-CA-24423)

Argued: September 27, 2000

Decided: December 1, 2000

Before WILKINSON, Chief Judge, and NIEMEYER and
LUTTIG, Circuit Judges.

---

Enforcement granted in part, denied in part, and remanded by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Luttig joined.

---

**COUNSEL**

**ARGUED:** Michael S. Mitchell, FISHER & PHILLIPS, L.L.P., New Orleans, Louisiana, for Dorsey Trailers. David Arthur Fleischer, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Stephen Anthony Yokich, CORN-FIELD & FELDMAN, Chicago, Illinois, for Intervenors. **ON BRIEFS:** Scott D. Schneider, FISHER & PHILLIPS, L.L.P., New Orleans, Louisiana; James M. Walters, FISHER & PHILLIPS, L.L.P., Atlanta, Georgia, for Dorsey Trailers. Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

**OPINION**

WILKINSON, Chief Judge:

Dorsey Trailers, Inc. appeals a National Labor Relations Board decision finding that the company committed various labor violations

at its plant in Northumberland, Pennsylvania. The Board ordered the company to, among other things, cease and desist from the ongoing labor violations and reopen its Northumberland plant. We find that substantial evidence supports the NLRB's conclusions regarding some of the company's violations of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act. We hold, however, that Dorsey Trailers did not violate Section 8(a)(3) by closing the plant, and it did not violate Section 8(a)(5) by failing to bargain to impasse with the union on the plant's relocation. Furthermore, we find the NLRB's restoration order beyond the Board's remedial power given the remaining violations. Because the decision of where to locate a business lies at the core of entrepreneurial discretion, enforcement of the NLRB's order shall be granted in part and denied in part. On remand, the order shall be modified in conformity with this decision.

I.

Dorsey Trailers manufactured flatbed and dump trailers at its Northumberland, Pennsylvania plant until late 1995. The plant had been unionized since 1967. The previous contract between the union and the company ran from March 4, 1992 until March 1, 1995. In that contract, the union made concessions because the plant had not been profitable. By early 1995, the plant had regained profitability. Indeed, the operating profit for the first six months of 1995 was $1,500,000.

All was not well at the Northumberland plant, however. In February of 1995, the union and the company started to negotiate a new collective bargaining agreement. The company wanted the ability to subcontract work and to mandate overtime. The company asserted that these provisions would allow Dorsey to meet the increasing demand for its trailers. The union wanted to regain some of the benefits it had conceded in the last contract. Consequently, it asked for wage increases while opposing the subcontracting and mandatory overtime provisions. Tensions also rose because the company instituted a new attendance policy which permitted the company to fire workers for fewer unexcused absences. The company refused the union's demand to bargain about the new policy.

Negotiations on the new contract became more heated as the March 1 expiration date approached. On February 23, the company reiterated

its demand for a mandatory overtime provision, and said that the company was prepared to endure a strike to achieve this goal. The company president, Marilyn Marks, said that she would shut down the plant if the parties could not reach an agreement on subcontracting and mandatory overtime. The company's lead negotiator told the union that the company had to decide whether to keep the plant in Northumberland or move it to another state. If subcontracting and mandatory overtime were not allowed, he said, the company would probably shut down the plant and move its operations to another facility. The plant manager told supervisors to tell employees that if employees went on strike, the plant would close. One supervisor told a union member that the president of the company had "no time to waste" on contract negotiation. The supervisor also stated that if the employees voted to strike, the president would close the plant. He later emphasized to a group of workers that closing the plant was "not a threat, it's a promise, but you didn't hear it from me."

On June 26, 1995, the strike began. In response, the company began to look at other options to fill the work orders that were back-logged due to the strike. On September 25, the company investigated purchasing a new facility in Cartersville, Georgia. The company found that the economics of the Cartersville plant surpassed the Northumberland plant in nearly all respects.

Specifically, the company found that the Cartersville plant layout allowed workers to build trailers along a 500-foot long assembly line. By contrast, the assembly line at the Northumberland plant was 250 feet long and had to make four sharp turns. This change in assembly line structure would allow the company to increase the number of trailers it could build. It would also provide more flexibility in determining the type of trailer to be built. Moreover, Cartersville's geographic location would substantially reduce shipping and freight costs since a large percentage of the company's customers were located in the Southeast. The State of Georgia also provided a free training program for employees, a tax credit of one thousand dollars per employee, and a twenty percent reduction in utility costs. Pennsylvania, by contrast, did little to entice the company to remain in Northumberland. The Cartersville plant also had an asphalt parking lot around the entire building, thereby reducing wear and tear on equipment by decreasing the amount of dust and dirt in the building. In

short, the company found that although the Northumberland plant was adequate, the Cartersville location would be much better for the company. By October 5, the company agreed to buy the Cartersville plant.

On October 9, the company informed the union of the impending purchase of the Cartersville plant, and of the possibility of closing the Northumberland facility and relocating the work to Cartersville. The company made clear that the continued operation of the Northumberland facility was open to bargaining. On October 16, the union made an unconditional offer to return to work. The company did not reinstate all of the strikers immediately.

The company told the union that thirty-one concessions were necessary to keep the plant in Northumberland. These included a five-year contract with an immediate twenty percent wage cut followed by a wage freeze for the duration of the contract. The parties met for the last time on November 6. The union made an extensive counter-proposal. On November 9, the company notified the union that it was closing the plant. By the end of the year, the company shut down the Northumberland facility. All employees were terminated. The Cartersville plant had a total net loss of $1,500,000 in 1996.

The NLRB General Counsel issued a complaint against Dorsey Trailers alleging that the company: 1) threatened union members with plant closure and job loss if they went on strike; 2) failed to immediately reinstate union workers after an unconditional offer to return to work; 3) encouraged union members to resolve disputes directly with supervisors; 4) refused to comply with the union's request for relevant information; 5) closed the Northumberland plant due to anti-union animus; 6) relocated work without bargaining to impasse; 7) created the impression of surveillance and threatened an employee with unspecified reprisals; and 8) unilaterally instituted a new attendance policy in violation of the collective bargaining agreement.

On December 1, 1997, the Administrative Law Judge (ALJ) ruled against the company on almost all counts, finding numerous violations of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA. The ALJ found that the strike was motivated at least in part by the company's unfair labor practices, and that therefore the strike was an unfair labor practice strike. Consequently, he held that the company violated the

Act by failing to promptly reinstate the strikers after their uncondi-
tional offer to return to work. He also found that the decision to relo-
cate the plant from Northumberland to Cartersville was a mandatory
subject of bargaining. He found that the company had not bargained
in good faith concerning the relocation decision and that no impasse
existed when the company decided to close the plant, thus violating
the Act. The ALJ further found that the relocation decision violated
the Act because it was motivated by a desire to retaliate against the
union for going on strike. He also held that the company committed
various other violations of the Act.

The ALJ ordered the company to cease and desist from its unlawful
conduct. He also ordered the company to, among other things, reopen
the Northumberland plant, reinstate the workers who were terminated
due to the closure of the plant, and repay workers for lost earnings.
On March 12, 1999, the NLRB affirmed the ALJ's findings and
adopted his order. Dorsey Trailers now appeals the Board's order.
The NLRB General Counsel cross-appeals for its enforcement.

## II.

The National Labor Relations Act is designed to encourage indi-
vidual employees to join labor unions and bargain collectively, while
at the same time ensuring that a company can control the functioning
of its business. *See* 29 U.S.C. §§ 141, 151 (1994); *Fibreboard Paper
Products Corp. v. NLRB*, 379 U.S. 203, 211 (1964). One of the funda-
mental purposes of the Act is to promote the peaceful settlement of
industrial disputes by prohibiting employers from engaging in unfair
labor practices and by promoting the collective bargaining process.
*See First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 674
(1981).

This case revolves around three provisions of the Act, Sections
8(a)(1), 8(a)(3), and 8(a)(5), under which the NLRB General Counsel
accused Dorsey Trailers of committing numerous unfair labor prac-
tices. *See* 29 U.S.C. §§ 158(a)(1), 158(a)(3) & 158(a)(5). Section
8(a)(1) makes it an unfair labor practice for an employer "to interfere
with, restrain, or coerce employees in the exercise" of their rights to
form and join a union, to bargain collectively, and to "engage in other
concerted activities for the purpose of collective bargaining or other

mutual aid or protection." 29 U.S.C. § 158(a)(1); *see also* 29 U.S.C. § 157. Section 8(a)(3) in relevant part makes it an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. . . ." 29 U.S.C. § 158(a)(5). The obligation to bargain collectively is further defined in Section 8(d) of the Act, which directs the union and the employer to "confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d). Matters falling within the category of wages, hours, and other terms or conditions of employment are mandatory subjects of bargaining. An employer commits an unfair labor practice under Section 8(a)(5) when it makes a unilateral change or otherwise fails to bargain in good faith on any mandatory subject. *See* 29 U.S.C. § 158(a)(5); *First National Maintenance*, 452 U.S. at 675.

### III.

### A.

This court will uphold the NLRB's findings of facts if they are supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319, 326 (4th Cir. 1997). The record supports the Board's holding that the company committed certain violations of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act.

Under Section 8(a)(1), the NLRB General Counsel presented a strong case that the company: 1) threatened the workers with plant closure and job loss if the union went on strike; 2) told workers that it would close the facility because it had no time to waste on negotiations; 3) directed employees to bring grievances to supervisors before going to the union; and 4) told workers not to talk to the union during working hours without a supervisor's approval. Accordingly, substantial evidence exists that the company violated Section 8(a)(1) in these four respects. *See CWI of Maryland*, 127 F.3d at 325-26. The record also indicates that the company unilaterally changed its attendance

policy and refused to furnish the union with information relating to employee attendance. Substantial evidence thus supports the Board's finding that the company violated Sections 8(a)(5) and (1) in these two respects. *See First National Maintenance*, 452 U.S. at 677; *Arrow Automotive Indus. v. NLRB*, 853 F.2d 223, 226 (4th Cir. 1988). Indeed, the company no longer contests the above violations.

The company does contend that it did not violate Section 8(a)(3) and (1) of the Act by failing to reinstate the strikers after their unconditional offer to return to work. We disagree. Although the company maintains that the strike was motivated solely for economic reasons, substantial evidence supports the Board's determination that the strike was an unfair labor practice strike. A strike that is caused in whole or in part by an employer's unfair labor practices is an unfair labor practice strike. *See Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 515 (4th Cir. 1998); *NLRB v. Stilley Plywood Co.*, 199 F.2d 319, 320-21 (4th Cir. 1952); *Northern Wire Corp. v. NLRB*, 887 F.2d 1313, 1319 (7th Cir. 1989); *General Drivers and Helpers Union, Local 662 v. NLRB*, 302 F.2d 908 (D.C. Cir. 1962).

The union voted to strike in part because of the unilateral change in attendance policy, the threats to close the plant down, and the supervisors' instructions to bring grievances to the company before going to the union. The company is correct that the union also went on strike for economic reasons — namely the mandatory overtime provisions and the right to subcontract. These reasons, however, do not eclipse the unfair labor practices that also precipitated the strike. The company admits that it did not promptly reinstate the strikers after their unconditional offer to return to work. This failure to reinstate the workers violated Section 8(a)(3) and (1) because the strike was an unfair labor practice strike. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967); *Newport News Shipbuilding and Dry Dock Co. v. NLRB*, 738 F.2d 1404, 1408 (4th Cir. 1984).

### B.

The company further argues that it did not violate Section 8(a)(3) of the Act by transferring work from Northumberland. On this point, we find the company's argument persuasive.

Section 8(a)(3) protects against work transfers or firings due to anti-union animus. *See Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 268-69 (1965); *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 250 (4th Cir. 1997). *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), requires a two step analysis in order to find a discriminatory transfer or discharge. *See also CWI of Maryland*, 127 F.3d at 330-32 (applying *Wright Line*). First, the NLRB General Counsel must prove by a preponderance of the evidence that anti-union animus was a substantial or motivating factor in the discharge. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400-02 (1983); *CWI of Maryland*, 127 F.3d at 330-31. Substantial evidence supports the Board finding that the company's anti-union animus played a motivating role in the move to the Cartersville facility. The company knew about the strike, repeatedly threatened to move the plant because of the strike, told workers to bypass the union in dealing with grievances, and unilaterally changed its attendance policies.

The analysis under *Wright Line* does not stop with the prima facie showing of anti-union animus, however. The second step of *Wright Line* shifts the burden to Dorsey Trailers to prove that it would have relocated its Northumberland operations even in the absence of anti-union animus. *See CWI of Maryland*, 127 F.3d at 330 (citing *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995)). If the employer can satisfy this burden, it has not violated Section 8(a)(3). In assessing the company's affirmative defense, the Board basically ignored the economic reasons why the company decided to move.

It is not, of course, our job to review de novo the factual determinations of the Board. *See Sam's Club v. NLRB*, 173 F.3d 233, 239-40 (4th Cir. 1999). Still, substantial evidence review is an objective assessment of the sufficiency of the evidence. *See Pirelli Cable Corp.*, 141 F.3d at 514. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations omitted). Indeed, a substantial evidence review requires a court to weigh "whatever in the record fairly detracts from the Board's fact finding as well as evidence that supports it." *Id.* (internal quotations omitted).

The record indicates that economic reasons drove the company's decision to move the plant from Northumberland to Cartersville. The

Board found that the company had not proven that it would have moved the plant despite the anti-union animus. In support of this point, the Board cited the fact that the Northumberland facility was the company's most profitable plant. The Board dismissed off-handedly the "alleged advantages offered by the Cartersville facility." A fair glimpse at the record, however, would have demonstrated the error of ignoring the company's economic arguments. *See Sam's Club*, 173 F.3d at 240 (inadequate reason by Board enough to over-turn its finding); *CWI of Maryland*, 127 F.3d at 326 (explaining that substantial evidence does not exist where the Board provides inade-quate reason for its finding).

The company searched for a facility after the strike began because it needed to fill backlogged orders, not because of anti-union animus. Indeed, Dorsey Trailers had to fill the two biggest orders in its history. Builders Transport, Inc. had just given the company an order of five hundred trailers. Michael Gordy, the plant manager, testified that he was concerned the strike would jeopardize the order. The company risked losing a large amount of business if it was unable to fulfill its obligations to customers like Builders Transport. The need to resume production led Dorsey Trailers to investigate the advantages of the Cartersville plant. Before deciding to relocate to Cartersville, the company tried to find other ways to fill its orders. It tried to use sala-ried workers and it investigated hiring temporary help. Gordy even visited the plants of two competitors, Oshkosh Trailers in Florida and Pines Trailers in Illinois, to inquire about their availability. Finally, the company turned to the Cartersville facility in order to restart pro-duction and to build the trailers that the Northumberland plant was not producing.

When the company learned that a plant in Cartersville was for sale, it sent three top managers to investigate the facility. The company found that the Cartersville location was "tremendous," and better suited its needs in every regard. The Cartersville plant would allow the production of more trailers because it was over seventy-five per-cent larger than the Northumberland facility. The size of the Carters-ville plant meant that the company could manufacture trailers on a 500-foot long assembly line. By contrast, the Northumberland plant had an assembly line only 250 feet long that had to turn four different times. Each turn slowed down production. In sum, the long assembly

line and the vast increase in the amount of space at Cartersville offered substantial efficiency gains over the Northumberland plant.

The company also contended that the Georgia location would reduce shipping costs by at least $100,000 per year because most of the flatbed trailers were sold to customers in the Southeast. Although the NLRB General Counsel currently disputes the amount of money saved by the difference in shipping costs, three of the company's major competitors — Great Dane Trailers, Fontaine Trailers, and Utility Trailers — were located in the same region of the country. The State of Georgia also provided a training program for new workers as well as a one thousand dollar tax credit per employee. In addition, the State promised to reduce Dorsey Trailer's utility costs by twenty percent. The Cartersville plant also offered an asphalt parking lot around the entire building, which would prolong the life of the company's equipment by substantially reducing dust.

The Board considered none of this evidence in the record, except to casually dismiss the shipping costs argument and to concede that the State of Georgia offered the company incentives to move to the state. The Board made no genuine effort to address the company's economic reasons for moving the plant. The Board simply stated that because the Northumberland plant was the company's most profitable operation, its asserted economic justification was a "pretext." This argument completely overlooks the fact that Dorsey Trailers made a reasoned business decision that for the long term, the Cartersville plant was a superior facility to the Northumberland plant. Although the strike might have precipitated the search for a new plant, economic reasons drove the company to purchase and retain the Cartersville facility. Therefore, substantial evidence does not support the Board's holding that the company would have remained in Northumberland absent the protected union activity.

An employer does not violate Section 8(a)(3) when it would have taken the same action for legitimate business reasons. *See Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251, 257 (4th Cir. 1994). Because the company met its burden under the second part of *Wright Line* by proving that legitimate business reasons drove the decision to relocate, the company did not violate Section 8(a)(3) when it transferred work from Northumberland to Cartersville.

C.

The company argues that it did not violate Section 8(a)(5) when it failed to bargain to impasse with the union on the plant relocation. Dorsey Trailers now concedes that it did not bargain to impasse on this point. The question, therefore, turns on whether the plant relocation was a "term or condition of employment," and thus a mandatory subject of bargaining. *See* 29 U.S.C. § 158(d). For the reasons that follow, we hold that it was not.

The Supreme Court's decision in *First National Maintenance v. NLRB* provides our starting point. *See* 452 U.S. at 666. *First National Maintenance* concerned a company that closed one of its facilities and terminated all of its workers there three weeks after the union attempted to bargain with the company. *See* 452 U.S. at 669-70. In *First National Maintenance*, the Supreme Court held that a company's decision to eliminate part of its business is not a term or condition of employment, and therefore not a mandatory subject of bargaining. *See First National Maintenance*, 452 U.S. at 686 (adopting Justice Stewart's concurrence from *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 217 (1964) (Stewart, J., concurring)); *see also* 29 U.S.C. §§ 158(a)(5), 158(d). The Court held that bargaining over the decision to partially close a business does not "advance the neutral purposes of the Act." *First National Maintenance*, 452 U.S. at 681. Because "Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed," partial closings are not mandatory subjects of bargaining. *Id.* at 676. Indeed, the Court stated that a business needs "some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice." *Id.* at 679.

Although the Court in *First National Maintenance* did not have to reach the question of whether a plant relocation is a term or condition of employment, this court made clear in *Arrow Automotive Indus. v. NLRB* that the reasoning of *First National Maintenance* encompassed plant relocations. *See Arrow*, 853 F.2d at 229-30. *Arrow* involved a company that remanufactured automobile and truck parts. It operated four plants: one each in Massachusetts, South Carolina, Arkansas, and

California. Each plant made identical products. *See Arrow*, 853 F.2d at 224. After the Massachusetts plant went on strike, the company relocated the Massachusetts operations to the pre-existing facility in South Carolina. *See id.* The company found that the South Carolina plant could "more efficiently" perform the work previously done at the Massachusetts facility. *Id.*

This circuit held that the move to South Carolina was not a term or condition of employment, and therefore not a mandatory subject of bargaining. *See Arrow*, 853 F.2d at 225. *Arrow* noted that *First National Maintenance* "established a per se rule that an employer has no duty to bargain over a decision to close part of its business." 853 F.2d at 227. *Arrow* emphasized, however, that the reasoning of *First National Maintenance* was not limited to partial closings. *See Arrow*, 853 F.2d at 228-30. Rather, the *Arrow* court's "conclusion that [the company's] closing decision was not a mandatory subject of bargaining is not dependent on the 'partial closing' label." *Id.* at 230. In *Arrow*, the company's actions, "however they might be labeled, were not a subject of mandatory bargaining when examined in light of the analysis set forth by the Supreme Court." *Id.* at 230. We emphasized, in fact, that cases were not "to be resolved by placing decisions within rigid categories such as 'partial closing,' 'relocation,' or 'consolidation.'" *Id.* at 229.

The reasoning behind such conclusions is straightforward. The ability to decide where to commit "investment capital" is so "fundamental to the basic direction of a corporate enterprise" that a plant relocation is not a term or condition of employment, and thus not a Section 8(a)(5) obligation. *Fibreboard*, 379 U.S. at 223 (Stewart, J., concurring). If the decision of where to locate a plant is, as the Supreme Court says, a core entrepreneurial decision, then the "benefit for labor-management relations and the collective bargaining process" cannot be deemed to outweigh "the burden placed on the conduct of the business." *First National Maintenance*, 452 U.S. at 679; *see also Arrow*, 853 F.2d at 230-32. The benefit to the collective bargaining process is limited because just like partial closings, the plant relocation decision is not "amenable to resolution through the bargaining process." *First National Maintenance*, 452 U.S. at 678. On the other side of the ledger, the burden to the company remains high. A company would lose the freedom to decide where to locate its business

and where to invest finite capital resources. *See id.* at 678-79; *Arrow*, 853 F.2d at 231-32 (stressing the "magnitude of the decision . . . to reallocate large amounts of capital"). In this case, Dorsey Trailers had to spend a significant amount of capital to buy its new Cartersville plant and to move its equipment there.

The Act itself provides support for the conclusion that a plant relocation is not a mandatory subject of bargaining. Certainly, there is no support in the statute for fitting plant relocations within the terms of Section 8(d). A plant relocation that results in termination may affect the "tenure" of employment, but tenure is not the same thing as a "term or condition of employment." 29 U.S.C. §§ 158(a)(3), 158(d). In the Act, the word "tenure" includes length of employment. *See* 29 U.S.C. § 153(a) (making clear that tenure includes length of employment by defining "tenure" to mean the length of employment at the NLRB); 29 U.S.C. § 153(d) (the "tenure" of the General Counsel of the NLRB is a four-year term). Tenure, or length, of employment is pointedly not one of the elements included in the mandatory bargaining obligation, which is triggered by Section 8(d) of the Act. *See* 29 U.S.C. § 158(d) (requiring employers to "confer in good faith with respect to wages, hours, and other terms and conditions of employment").

This distinction between the concept of "tenure" and that of "terms and conditions of employment" is borne out by other sections of the statute. Section 8(a)(3), for instance, makes it an unfair labor practice to discriminate "in regard to hire or tenure of employment *or* any term or condition of employment . . . ." 29 U.S.C. § 158(a)(3) (emphasis added). Section 8(a)(3) thus distinguishes "tenure" from a "term or condition of employment." Indeed, the Supreme Court itself has recognized this distinction. *See NLRB v. Waterman Steamship Corp.*, 309 U.S. 206, 218-19 (1940). This statutory separation of "tenure" from "term or condition of employment" suggests tenure is not synonymous with terms and conditions of employment under Section 8(a)(3). *See, e.g., Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion) (it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"); *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative").

To hold, therefore, that a plant closure or relocation or like decision that affects the tenure of employees is a term or condition of employment under Section 8(d) would do violence both to the Supreme Court's decision in *First National Maintenance* and to the language of the Act. *See, e.g., Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (it is a "basic canon of statutory construction that identical terms within an Act bear the same meaning"); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme — because the same terminology is used elsewhere in a context that makes its meaning clear."). Bargaining over the effects of a decision to close or relocate the plant, by contrast, is a mandatory subject of bargaining precisely because the effects of the decision concern matters such as severance pay and retirement benefits. Section 8(d) specifically includes these matters and others like them because they are "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). On the other hand, the language of the statute suggests that "terms and conditions of employment" need not include entrepreneurial decisions that have the effect of necessarily terminating employment. *See Fibreboard*, 379 U.S. at 223 (Stewart, J., concurring).

Of course, to recognize the statutory distinction is not to ride it for all it is worth. *See Fibreboard*, 379 U.S. at 221-22 (Stewart, J., concurring) (recognizing limitations of phrase "conditions of employment" but listing some subjects touching length and conditions of employment that could trigger a mandatory bargaining obligation). If, however, Congress meant to include such traditional management decisions as plant closures and relocations within the set of bargainable obligations, it stopped far short of saying so in Section 8(d). To rest such a far-reaching bargaining obligation on such a thin statutory reed would have judges expand the contours of the NLRA beyond all proper bounds. *See, e.g., First National Maintenance*, 452 U.S. at 676 ("Despite the deliberate open-endedness of the statutory language, there is an undeniable limit to the subjects about which bargaining must take place."); *Fibreboard*, 379 U.S. at 221 (Stewart, J., concurring) ("Only a narrower concept of 'conditions of employment' will serve the statutory purpose of delineating a limited category of issues which are subject to the duty to bargain collectively."). "Terms and conditions of employment" is simply not an all-inclusive phrase.

Indeed, another circuit has already held that Dorsey Trailers' decision to subcontract part of its work to the company that previously operated the Cartersville facility was not a mandatory subject of bargaining. *See Dorsey Trailers, Inc. v. NLRB*, 134 F.3d 125, 131 33 (3d Cir. 1998).

The NLRB General Counsel argues, however, that *Dubuque Packing Co.*, 303 NLRB 386 (1991), *enforced sub nom. United Food & Commercial Workers Int'l Union Local 150-A v. NLRB*, 1 F.3d 24 (D.C. Cir. 1993), compels the result that the plant relocation is a mandatory subject of bargaining. We disagree. *Dubuque Packing* is simply incompatible with our decision in *Arrow*. Indeed, in *Arrow* we specifically disapproved of *Otis Elevator Company*, 269 NLRB 891 (1984) (*Otis II*), which was the predecessor of *Dubuque Packing*. *Dubuque Packing*, just like *Otis II*, is "flatly inconsistent with *First National Maintenance*. Where an employer closes down part of its operation . . . the Court has made clear that bargaining over the decision is not required." *Arrow*, 853 F.2d at 228. Moreover, *Dubuque Packing* posits a false dichotomy between economic and labor costs. Under *Arrow*, however, economic reasons for moving "are not reasons distinct and apart from a desire to decrease labor costs." 853 F.2d at 228. Indeed, labor costs are "inescapably" a part of the economic calculus that a company must consider in deciding whether to relocate. *Id.*

The union contends that *Arrow* is distinguishable because *Arrow* did not involve a claim of anti-union animus. This distinction is unavailing. The phrase "terms and conditions of employment" does not magically change meaning with the infusion of anti-union animus. Section 8(a)(5) simply does not cover plant relocations or partial closings. This does not mean, of course, that the union and the General Counsel are without a remedy for anti-union animus. The relevant section to redress this animus is the broader language of Section 8(a)(3), not the more circumscribed text of Section 8(d) and 8(a)(5). *See First National Maintenance*, 452 U.S. at 682 ("[T]he union's legitimate interest in fair dealing is protected by § 8(a)(3)."); *Darlington*, 380 U.S. at 268-69. Furthermore, the union can certainly protect its interest through bargaining over the effects of the decision to relocate, which is a mandatory subject of bargaining under Section 8(a)(5). *See First National Maintenance*, 452 U.S. at 681-82; *Arrow*,

853 F.2d at 231. And, of course, nothing in the Act prevents permissive bargaining over a closure or relocation decision. What we decline to do, however, is to expand the scope of mandatory or impasse bargaining to matters which the relevant statutory sections do not include. Because a plant relocation is not a term or condition of employment, the company did not violate Section 8(a)(5) by failing to bargain to impasse on the work transfer.

### D.

The Board used its remedial powers under § 10(c) to order the restoration of operations at the Northumberland plant. *See* 29 U.S.C. § 160(c) (giving Board the power to issue an order requiring company "to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees . . . as will effectuate the policies of" the NLRA). The company alleges that requiring it to reopen the plant will cause an undue economic burden.* *See Fibreboard*, 379 U.S. at 216 (establishing undue burden standard); *see also Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 795-6 (4th Cir. 1998) (applying undue burden test). Regardless, a restoration order is beyond the authority of the Board when the unfair labor practice does not involve the discriminatory closing of a company facility. *See, e.g., Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 957 (D.C. Cir. 1988). We have found that the company did not commit an unfair labor practice by moving the plant from Northumberland to Cartersville or by failing to bargain to impasse about the move. Consequently, the Board's order is not supportable given the remaining violations of the Act.

Indeed, the Supreme Court warned that restoration orders "trench[ ] . . . closely upon otherwise legitimate employer prerogatives." *Darlington*, 380 U.S. at 276. When a company must expend significant funds or make new capital investments to restore operations, the order will be unduly burdensome given its economic cost. *See Coronet Foods*, 158 F.3d at 794-96 (despite the fact that company violated

---

*The company asserts in its brief that the Northumberland facility "has, in fact, been sold." We do not rely on this point, however, since this evidence is not in the record submitted to us, and was not in the record before the ALJ or the Board.

Section 8(a)(3) by shutting down transportation facility, an order requiring company to restore the abolished department constituted an undue burden and therefore was invalid). Restoration orders to reopen a facility are presumptively suspect given the substantial cost in both human and monetary terms. *See id.* In this case, the unfair labor practices that have been upheld come nowhere close to allowing the Board to order such a draconian remedy.

## IV.

The decision of where to locate a business is fundamentally a managerial decision. Companies must account for the costs of operating a facility as well as the benefits of working in a particular place. Thus a company is under no statutory obligation to bargain about judgments that lie at the entrepreneurial heart of an enterprise. *See First National Maintenance*, 452 U.S. at 676. In this case, the company made its decision to relocate its plant for a variety of economic reasons. Although Dorsey Trailers violated the Act in the ways we have recounted, it did not do so by relocating its plant to a more favorable business environment or by failing to bargain to impasse about the move. Accordingly, enforcement of the Board's order is granted in part and denied in part. On remand, the order shall be modified to conform with this decision.

*ENFORCEMENT GRANTED IN PART,*
*DENIED IN PART, AND REMANDED*