PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WXGI, INCORPORATED, and its
successor, GEE COMMUNICATIONS,
INCORPORATED,

*Petitioners,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent.*

No. 00-1323

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

WXGI, INCORPORATED, and its
successor, GEE COMMUNICATIONS,
INCORPORATED,

*Respondents.*

No. 00-1510

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
(5-CA-27367)

Argued: December 5, 2000

Decided: March 13, 2001

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

Petition for review denied and cross-application for enforcement granted by published opinion. Judge Traxler wrote the opinion, in which Chief Judge Wilkinson and Senior Judge Hamilton joined.

---

**COUNSEL**

**ARGUED:** Tim Schulte, Thomas Hunt Roberts, THOMAS H. ROBERTS & ASSOCIATES, P.C., Richmond, Virginia, for WXGI and Gee. Robert James Englehart, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Leonard R. Page, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Fred L. Cornnell, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

**OPINION**

TRAXLER, Circuit Judge:

WXGI, Inc., and its successor Gee Communications, Inc., petition this court for review of the February 29, 2000 Decision and Order of the National Labor Relations Board (the "Board") determining that WXGI, Inc. violated § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), (a)(3) (West 1998) (the "Act"), by discharging four employees because of their actual or suspected union-organizing activities, and that Gee Communications, Inc. was a successor to WXGI, Inc. for purposes of imposing joint and several liability. The Board cross-petitions for enforcement of its Decision and Order. For the reasons stated below, we deny WXGI, Inc.'s petition for review and grant the Board's cross-petition for enforcement.

I.

This case arises out of the termination of four employees of WXGI, Inc., which operated a country music radio station (WXGI AM-950)

in Richmond, Virginia. In March 1997, J.D. Keatley ("Keatley"), the owner of WXGI, Inc., entered into a contract to sell the radio station to David Gee ("Gee"), the future president of Gee Communications, Inc. ("Gee Communications"). Problems soon arose, however, when Keatley attempted to renege on the agreement, prompting Gee to file a lawsuit to force Keatley to complete the transfer of ownership of the radio station. In June 1997, Keatley and Gee reached a settlement agreement under which WXGI, Inc. hired Gee as the general manager of the radio station pending completion of the transfer from Keatley to Gee. Keatley, however, remained the owner of the station and maintained control over certain business matters, including payroll.

On August 29, 1997, the Federal Communications Commission approved the assignment of the WXGI radio license to Gee Communications. However, the relationship between Gee and Keatley continued to deteriorate to the point that Gee obtained a court order on September 29, 1997, barring Keatley from the station premises. Nevertheless, Keatley remained the owner of the station until October 17, 1997, when the business was finally transferred from WXGI, Inc. to Gee Communications.

During this acrimonious time, WXGI, Inc. had approximately 12 to 14 employees. This case arises out of Gee's September 30, 1997 termination of four of these employees for their actual or suspected organizing activities at the station on behalf of the United Food and Commercial Workers International Union, Local 400, AFL-CIO (the "Union"). Three of the terminated employees, Mark Matthews, Steven Giles, and Wiley Southworth, were prime-time on-air radio personalities for WXGI, Inc. The fourth was sales account executive, and sometimes on-air personality and country music performer, Bobby Overman a/k/a Bobby Shannon ("Shannon").[1] Shannon had been the general manager of WXGI, Inc. for Keatley, until Gee assumed the position under the June 1997 settlement agreement. As part of his duties, Shannon had solicited and handled the Union's sales account for WXGI, Inc.

---

[1] It appears that "Bobby Shannon" was the name used by Bobby Overman in his capacity as an on-air personality and country music performer. To remain consistent with the Board's order, we too refer to him as "Shannon."

Shannon, Matthews, Giles and Southworth (collectively the "discriminatees") were viewed by Gee as a close-knit, cohesive group or clique led primarily by Shannon. They were also viewed as loyal to Keatley in the dispute between Gee and Keatley over transfer of the radio station. Hence, when Gee assumed the position of general manager of the radio station in June 1997, the atmosphere was tense. In addition to the acrimonious atmosphere caused by the feud between Keatley and Gee, it became known that Gee intended to make at least some changes in the station operation and programming format. Of particular distaste to the discriminatees, Gee sought to rehire John Trimble as a station manager for Gee Communications. Trimble had been a prior general manager for Keatley's WXGI, Inc., but had been terminated by Keatley some time before. He was admittedly not well-liked or well-received by the discriminatees.

On September 1, Gee met with Trimble to discuss Trimble's potential return to the WXGI radio station, at which time Trimble presented Gee with a document entitled "John Trimble's Operating Proposal for WXGI Radio." J.A. 69. Among other things, the document proposed a new program format and vested Trimble with the sole authority to select all music played by the on-air personalities. It also proposed the termination of all current on-air personalities and control board operators, with the exception of on-air personalities Don Price and Phillip Rucker. Trimble proposed that notices of termination be given on September 15, 1997, with an effective termination date of September 30, 1997. Under the proposal, Trimble also vested in himself the authority to select all future on-air personalities. Gee, however, balked at Trimble's termination demand. Because the Union, which already placed a fairly large amount of business with the station, had indicated that it intended to increase its sales account with the station, Gee wanted to keep Shannon on in a full-time capacity. He also wanted to retain Matthews and at least one other on-air personality in at least some regularly-scheduled work and the remainder of the on-air personalities, including Giles and Southworth, in some form of part-time or on-call employment.

On September 9, 1997, Gee posted an announcement on the bulletin board in the station office notifying the employees that Trimble would be re-joining WXGI radio. Although it does not appear that the four discriminatees were aware of Trimble's specific request that all

on-air personalities be terminated, Giles at least became concerned that Trimble's arrival would herald a less secure job future for him and his three friends. It appears undisputed that the discriminatees' discomfort with the prospect of Trimble's return was made known to Gee.

On September 15, 1997, Gee responded to Trimble's operating proposal orally and in writing, generally accepting the proposal with the exception of the employee termination request. Instead, Gee agreed to inform all present on-air personalities that they would be used as "on call" only, at Trimble's request, and that Mark Matthews and David Holt, another on-air personality, would be asked to take some regularly scheduled weekend work. There was no evidence that Gee at any time thereafter informed Trimble that his intent to retain all four discriminatees, and other on-air personalities, had changed.

On September 21, 1997, "Shooters" restaurant and bar hosted a traditional, "old time," country music charity event. Although WXGI, Inc. did not sponsor the event, Shannon, Giles and Southworth served as masters of ceremonies, and Matthews attended. Gee testified that he received telephone reports that the four had asked customers to write letters protesting the station's recent decision to move from a "legendary" country music format to a more "modern" country music format. Although Gee later described the incident at Shooters as a "rebellion," it did not cause him to cease ongoing discussions with Matthews about continued employment or prompt him to withdraw an outstanding employment offer which he had previously extended to Shannon. Nor were Giles or Southworth confronted about the incident.

During this time, the atmosphere at the radio station continued to be quite unsettled in the minds of the discriminatees. Trimble's proposed deadline for providing on-air personalities with a notice of their termination — September 15 — had passed, consistent with the evidence that Gee intended to retain all four discriminatees in some capacity after the transfer of ownership of the station, but there is no indication that the discriminatees were aware of this fact. Gee had apparently been in some negotiations with Shannon and Matthews concerning their potential for continued employment, but Giles and Southworth may well have feared for their job security altogether.

Coincidentally, WXGI was to operate a remote broadcast from the booth of the Union at the Virginia State Fair beginning on September 26, 1997. At a breakfast meeting two days before, Shannon, who was continuing to handle the Union's account, introduced Matthews, who was scheduled to perform the remote broadcast from the Union booth, to Union Representative Paul Evans. Evans discussed the situation at the station with Matthews and gave him cards to distribute to the station employees for an organizing campaign, along with a Union bumper sticker and a Union button to show his support. Later that day, Giles also met with Evans at the Union booth at the fairgrounds. Evans told Giles about his conversation with Shannon and Matthews earlier that day, and his suggestion that the radio employees seek Union representation. Giles also obtained Union bumper stickers and Union buttons to show support for the Union, and Union cards to be filled out by coworkers interested in the Union.

Between September 24 and September 28, both Matthews and Giles signed and returned a Union card to Evans. Matthews placed a Union bumper sticker on his car, drove to the station at least three separate times with the sticker visible on his car, and spoke with three or four employees about Union representation. Giles also spoke openly to eight or nine employees at the station about the Union, and was successful in obtaining signed Union cards from seven of his coworkers. Giles also displayed a Union bumper sticker on his automobile on Monday, September 29, and wore a Union button to work on that date. Shannon testified that he did not discuss the Union with anyone, but did sign a card given to him by Giles. Southworth testified that Giles also urged him to sign a card, but that he had not done so prior to his termination.[2]

On September 30, 1997, "judgment day" according to Gee, the group of four were summarily terminated, effective immediately. Giles testified that he arrived at the station at 4:45 a.m. for his scheduled morning shift. As he parked in the front lot, he observed Matthews' car in the lot with the Union bumper sticker on it. At 8:00

---

[2]Although Shannon and Southworth apparently thought the cards only indicated a desire to hear more about the Union, the card purportedly signed by Shannon contained authorization for representation by the Union, not merely an invitation to hear more about it.

a.m., Giles spoke with Gee in the control room for about ten minutes and Giles had his Union button on at the time. Shortly after 10 a.m., as Giles was ending his morning shift, Gee terminated Giles. The termination letter indicated that the termination was due to Gee's belief that his new format change was "contrary to [Giles'] preference" and to Giles' "stated strong objection and reaction to the station's decision to employee [sic] John Trimble." J.A. 46. During the conversation, Giles testified that Gee also referred to him as a member of Keatley's "team."

Southworth, who was scheduled to begin his shift at the end of Giles' shift, was terminated almost immediately after Giles. His termination letter indicated only that it was due to his "strong objection and reaction to the station's decision to employee [sic] John Trimble." J.A. 47. Southworth had no further discussion about the matter with Gee. Although Gee would later claim that Southworth was terminated in part due to his participation in the Shooters' incident, no mention of this incident was made to Southworth at the time or in his letter of termination.

Matthews was terminated just prior to his scheduled, 2 p.m. remote broadcast from the Union's booth at the State Fair. Exactly what Gee told Matthews, and who was present during the conversation, is disputed. According to Matthews, Gee arrived and asked Matthews to talk privately, but Matthews refused because he was about to begin his broadcast. Gee then proceeded to terminate Matthews in the presence of two Union representatives, Tom Rogers and Willie Snow. Gee informed Matthews that he had heard about the efforts of Matthews, Southworth, and Giles to form a union and that he was disheartened because Matthews had kept things from him, lied to him, and deceived him. According to Matthews, Gee also told him that if Matthews reconsidered his position over the next thirty days, Gee would be willing to speak to him about future employment with the station. Union representatives Rogers and Snow confirmed overhearing Gee's references to the union-organizing activities as being the impetus for Matthews' termination and, afterwards, the Union flatly refused to accept Gee's proposed substitute for Matthews at the broadcast booth, indicating that there were indeed Union persons present when Matthews was terminated and that the act had immediately engendered ill-will with the Union.

Like Giles' and Southworth's termination letters, Matthews' written termination letter purported to blame the termination decision upon a new format change which Gee felt to be "contrary to [Matthews'] preference" and Matthews' "stated strong objection and reaction to the station's decision to employee [sic] John Trimble." J.A. 45. However, it also referenced an opportunity for Matthews to enjoy future employment at the station:

> This termination for you is contrary to my stated desire to offer you continous [sic] employment. The decision to terminate your employment comes with recent information of your behavior and remarks! I encourage you to reflect over the next 30 days and if interested, reapply to WXGI.

J.A. 45.

Gee categorically denies telling Matthews that he was being terminated for his union affiliation or, for that matter, mentioning union activities at all. Despite the language of the termination letter, he contends instead that Matthews was terminated in private pending an investigation of a complaint WXGI had received from a member of the community which Gee felt might implicate Matthews. According to Gee, on September 29, David Holt informed him that Holt had received a telephone call a day or so earlier from a woman in the community claiming that an employee known as "Cowboy" — which apparently is Matthews' on-air personality name — had engaged in improper, and perhaps illegal, conduct. Gee asserts that this alleged complaint was the primary reason for Matthews' termination, and that the reference to a possibility of reinstatement after thirty days was for the purpose of allowing Gee an opportunity to investigate further.[3]

Shannon was terminated, also at the State Fair location, at about the same time as Matthews. According to the Gee, Shannon was the "catalyst" of the group of four and was to be fired as part of their

---

[3]The complaint appears to have never been substantiated and the parties earlier stipulated that its substance was not relevant to the unfair labor practices charge. Because the Board's rejection of the complaint as the motivation for Matthews' discharge is also not dependent upon its particular details, we see no reason to elaborate further.

"judgment day." Shannon testified that he personally observed Gee talking to Matthews at the broadcast booth, that Union representatives were present at the time, and that he personally heard some reference being made to a thirty-day time frame. He did not, however, profess to have overheard any specific discussion about the Union or about any union-organizing activities. When Shannon entered the booth area, Gee asked Shannon to accompany him outside where Shannon was terminated, purportedly for not being a "team player." Shannon's termination letter, however, gave no clear reason for the discharge, referencing only a June 1997 agreement between Keatley and Shannon concerning Shannon's termination:

> On June 3, 1997 you and J.D. Keatley entered into a termination notice of your 4-25-97 contract of employment! As a further clarification of any intent on part of W.X.G.I., or Gee Communications, Inc. I now also reaffirm or establish the desire of W.X.G.I. to terminate its relationship with you!

J.A. 44. Of course, this is inconsistent with Shannon's continued employment, with Gee at the helm of WXGI, Inc., from June through September and an outstanding written offer of employment Gee had extended to Shannon which Shannon had signed, but not yet returned. A few hours after his discharge, Shannon went to Keatley's home to obtain his paycheck. In response to Shannon's inquiry, Keatley told Shannon that he knew Gee had terminated Shannon and, furthermore, that Gee knew about the union-organizing attempt.

Following the terminations, the Union filed an unfair labor practices charge against WXGI, Inc. and Gee Communications. The Board issued a complaint on September 23, 1997, and the matter was assigned to an Administrative Law Judge ("ALJ"). The ALJ conducted a four-day hearing, and issued a decision on August 29, 2000, concluding that WXGI, Inc. violated § 8(a)(1) and § 8(a)(3) of the Act by terminating Shannon, Matthews, Giles, and Southworth for their actual or perceived union-organizing activities at the station, and that Gee Communications, Inc. was a successor corporation to WXGI, Inc. subject to joint and several liability for the violations. A panel of the Board issued a Decision and Order affirming the ALJ's findings and conclusions and adopting his recommended Order with one modification. Among other things, the Board ordered WXGI, Inc., and its

successor Gee Communications, to cease and desist from discharging
employees or telling them that they are being discharged because of
actual or suspected Union activities by them or other employees; to
cease and desist from coercively interrogating its employees about the
Union activities by them or other employees;[4] and to reinstate Shan-
non, Giles, Southworth, and Matthews with back pay and expunge
their employment records of the unlawful discharges.[5]

WXGI and Gee Communications now petition this court for review
of the Board's Decision and Order, *see* 29 U.S.C.A. § 160(f) (West
1998), asserting that the Board's findings are not supported by sub-
stantial evidence and that Gee Communications was not a successor
to WXGI, Inc. The Board filed a cross-application for enforcement of
the Decision and Order. *See* 29 U.S.C.A. § 160(e) (West 1998).

## II.

WXGI, Inc. and Gee Communications first assert that the Board's
determination that WXGI, Inc. violated Section 8(a)(1) and (a)(3) by
terminating Shannon, Matthews, Giles, and Southworth should be

---

[4]A few days before the trial began before the ALJ, Gee's attorney con-
tacted a part-time announcer with WXGI. Among other things, the attor-
ney asked the employee if his working conditions were pleasant, whether
he knew anything about a union forming at the station, and whether he
had filled out a union card. When the employee admitted that he had
filled out a card, the attorney asked him if he was going to form a union.
The Board concluded that Gee Communications, by its agent, coercively
interrogated the employee concerning union activities without complying
with the requisite standards for trial preparation investigations, constitut-
ing a violation of § 8(a)(1) of the Act. Because petitioners have not pur-
sued a challenge to this violation on appeal to this court, the Board's
order with regard to it is entitled to summary enforcement. *See NLRB v.
Frigid Storage, Inc.*, 934 F.2d 506, 509 (4th Cir. 1991).

[5]The ALJ had recommended that the Board order Shannon to be rein-
stated on a full-time basis, but that Giles, Southworth, and Matthews be
reinstated only to the on-call or part-time status they would have alleg-
edly held under Gee's plan. Because there were indications that two
other on-air personalities with WXGI, Inc. were retained on a full-time
basis, the Board instead deferred the issue of the type of reinstatement
and amount of back pay to the compliance stage.

overturned because the alleged discriminatees were terminated not for their actual or perceived union activities, but for obvious and lawful business reasons. We disagree.

### A.

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of the Act. 29 U.S.C.A. § 158(a)(1). Under Section 7, employees are guaranteed, among other things, "the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C.A. § 157 (West 1998). Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C.A. § 158(a)(3). In other words, Section 8(a)(3) directly "protects [employees] against work transfers or firings due to anti-union animus." *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 839 (4th Cir. 2000).

In order to make a prima facie showing of a discrimination violation under Section 8(a)(3) of the Act, the General Counsel must demonstrate by a preponderance of the evidence that: (1) the employee was engaged in protected activity, such as union-organizing activity; (2) the employer was aware of the protected activity; and (3) the protected activity was a substantial or motivating reason for the employer's decision to take an adverse employment action against the employee. *See Sam's Club v. NLRB*, 173 F.3d 233, 242 (4th Cir. 1999). Such showing may be by either direct or circumstantial evidence. *Id.*

Once the General Counsel has made the requisite showing, the burden shifts to the employer to produce evidence of a legitimate business motive for the adverse employment action. *Id.* In other words, the employer must produce evidence that it would have taken the same adverse action in the absence of employee participation in protected activity and anti-union animus. *See id.* at 242-43; *Dorsey Trailers*, 233 F.3d at 839. "Thus, an employer might show that a worker's deficiencies, economic necessity, or a legitimate business policy compelled disciplinary or other adverse action." *Sam's Club*, 173 F.3d at

242-43 (internal quotation marks omitted). In the face of such a showing, the General Counsel may not simply assert or declare that the proffered reasons are pretextual; rather, the General Counsel must present substantial evidence "that anti-union animus [actually] motivated the employer's choice." *Id.* at 243.

When reviewing a decision of the Board, we are bound by the Board's factual findings if they are supported by substantial evidence on the record as a whole. *See* 29 U.S.C.A. § 160(e) ("[Q]uestions of fact . . . supported by substantial evidence on the record considered as a whole shall be conclusive."); 29 U.S.C.A. § 160(f) (same). We likewise examine the Board's application of the law to the facts to determine whether it is "supported by substantial evidence based upon the record as a whole." *Sam's Club*, 173 F.3d at 239. "Substantial evidence is 'more that an scintilla' but 'less than a preponderance' of evidence. *Id.* It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). When engaged in fact finding, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Sam's Club*, 173 F.3d at 239-40 (internal quotation marks omitted). However, the Board's findings will not be overturned if "it would have been possible for a reasonable jury to reach the [same] conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998). Finally, although we review questions of law de novo, we give deference to the Board's interpretation of the Act "if it is reasonably defensible." *Industrial Turnaround Corp. v. NLRB*, 115 F.3d 248, 251 (4th Cir. 1997); *see also Sam's Club*, 173 F.3d at 239.

### B.

In this case, WXGI Inc. and Gee Communications claim that David Gee had no knowledge of the short-lived union-organizing activities occurring at the station and that such activities played no role in the decision to terminate the four discriminatees. The Board's findings to the contrary, they further assert, are not supported by substantial evidence. We disagree.

1.

We are satisfied that substantial evidence supports the Board's findings that Gee was aware of the union-organizing activities at the station. The union-organizing activities at WXGI AM-950, a small employer with less than 15 employees, began on September 24, 1997. The four discriminatees were terminated on September 30, 1997. In the interim, two of the four discriminatees placed Union bumper stickers on their cars, which were parked in front of the station in plain view of Gee and all of the other employees, spoke openly with at least eight employees at the station about the Union, and obtained seven signed Union cards. At least one of the four wore a Union button in the workplace and, on at least one occasion, in the presence of Gee and while speaking with him. Also, Keatley's knowledge of the union-organizing activities of the four discriminatees, while not imputed to Gee by the Board, substantiated the claim that the activity occurred openly enough and to such an extent that reports of it came to his attention despite his absence from the station. Also, Gee admitted that other employees had reported to him behavior which they considered to be divisive and disloyal; and, the ALJ felt this evidence created a fair inference that the reports included accounts of union-organizing activity. Also, of course, there was the evidence that Gee specifically referred to the union-organizing attempts during his termination of Matthews. Accordingly, we are satisfied that substantial evidence supports the Board's finding that Gee knew about the union-organizing activities at the radio station prior to his termination of the four discriminatees.

2.

We are likewise satisfied that the Board's finding that Gee acted with a discriminatory motive when he terminated Shannon, Matthews, Giles, and Southworth is supported by substantial evidence.

As previously outlined, there was substantial evidence in the record that Gee knew of the union-organizing activities at the station and the timing of the discharges could hardly be closer to the onset of that activity. Perhaps the starkest evidence of discriminatory motive, however, was Matthews' testimony that Gee admitted his termination was the result of union activities. This testimony was corroborated by two

Union officials and to a lesser extent by Shannon. WXGI, Inc. and Gee Communications assert that this never occurred and that the ALJ erred in crediting the testimony of Matthews and the others over that of Gee on the issue. In conjunction with this error, they further assert, the ALJ failed to "consider adequately" the evidence they presented which purportedly supports a contrary finding that (1) Matthews was terminated because of a complaint the station received that seemed to implicate him in unlawful conduct; and (2) the reference to a possible reinstatement after thirty days was to allow Gee an opportunity to investigate the complaint. First, the Board's rejection of Gee's assertion that he terminated Matthews as a result of a complaint seems well-justified. Although a complaint against a man called "Cowboy" appears to have been received by Holt from a woman in the community, he conducted no independent investigation and was so unconcerned that he misplaced the complainant's telephone number and neglected to even mention it to Gee until days later. Despite Gee's current attempts to rely upon the complaint as the "last straw" reason for Matthews' termination, Gee did not discuss the complaint with Matthews prior to or during the termination of Matthews or reference it in Matthews' termination letter. Similarly, Gee's assertion that he intended to conduct an investigation of the complaint to determine if Matthews could be reinstated within thirty days highlights the post-hoc nature of the purported justification. Although Gee eventually interviewed the woman who had complained, he only did so after Matthews filed a claim for unemployment compensation. Gee never forwarded the complaint to law enforcement officials, and the parties later stipulated that the merit of the complaint was not relevant to the unfair labor practices charge. As found by the Board, Gee's assertion is at best that "Matthews was discharged purportedly, in part, because of an uninvestigated complaint, the substance of which he was not informed." J.A. 12-13.

Perhaps most telling, however, is the language of the termination letter to Matthews. In the letter, Gee encouraged Matthews "to reflect [on his behavior and remarks] over the next 30 days and if interested, reapply to WXGI." J.A. 45. Absolutely no reference was made to Gee's purported intent to investigate a complaint, or even to investigate Matthews' unspecified "behavior and remarks." Indeed, the letter indicates Gee's intent to do nothing, placing all affirmative action upon Matthews if he wished further employment. Needless to say, it

more than strains credulity to believe that Gee would fire an employee for an unsubstantiated report of alleged criminal behavior, conduct no investigation, and decline to forward the information to law enforcement authorities, but express an intent to consider rehiring the employee so long as the employee personally "reflected" upon his criminal behavior. In sum, substantial evidence on the record as a whole supports the Board's determination that Gee's reference to Matthews' "behavior and conduct" was directed to Matthews' union-organizing activities as opposed to the alleged complaint received by Holt.

Secondly, we are unpersuaded by the argument that the ALJ made unsupported and ill-advised credibility determinations in reaching his findings with regard to the heavily disputed conversation between Matthews and Gee at the fairgrounds. After observing the testimony and the demeanor of Gee, Matthews, Snow, and Rogers, the ALJ discredited Gee's testimony and credited that of the other three men concerning Snow and Rogers' presence in the booth and Gee's reference to Matthews' union-organizing activities as a motivating factor for Matthews' termination.

"[T]he balancing of witnesses' testimony is at the heart of the fact-finding process, and it is normally not the role of reviewing courts to second-guess a fact-finder's determinations about who appeared more 'truthful' or 'credible.'" *Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 71 (4th Cir. 1996). Accordingly, "[a]bsent extraordinary circumstances, we will not disturb a factfinder's credibility determinations." *Columbus-America Discovery Group v. Atlantic Mutual Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995); *see also Sam's Club*, 173 F.3d at 240. "Exceptional circumstances include those instances when 'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Sam's Club*, 173 F.3d at 240 (quoting *NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319, 326 (4th Cir. 1997)).

In this case, the ALJ provided sound reasons for his credibility determinations. For example, the ALJ pointed out numerous inconsistencies in Gee's testimony, such as the fact that Gee's testimony with respect to the reason for the discharges was inconsistent with his own letters of discharge and that his failure to investigate the alleged com-

plaint of improper conduct by Matthews contradicted his testimony that he intended to do so. With regard to Matthews specifically, the ALJ noted that the testimony of Matthews, Rogers, and Snow confirmed what Gee's letter to Matthews implied — that "Matthews was being terminated because of his disloyal support of the Union and that his discharge could be rescinded if Matthews recanted his union allegiance." J.A. 16. Also, the ALJ pointed out that Rogers' and Snow's testimony that anti-union animus was the motivating factor was corroborated at least in part by the fact that, immediately after Matthews was terminated, Matthews' replacement at the Union booth was told that he was not welcome.

In summary, while we are mindful of the fact that there were inconsistencies in much of the testimony presented to the ALJ by the witnesses present at the Union booth that day, we are confident that the ALJ carefully considered the testimony before him and made reasonable determinations regarding the credibility of the witnesses. The ALJ provided sound reasons for his determinations and we can discern no reason to disregard them.

## C.

We turn now to the issue of whether the Board improperly rejected Gee's claim that Matthews, Giles, Southworth, and Shannon would have been terminated for legitimate business reasons, regardless of the presence of union-organizing activity or anti-union animus. *See Sam's Club*, 173 F.3d at 242-43; *Dorsey Trailers*, 233 F.3d at 839.

According to Gee, all four discriminatees were terminated because they were on Trimble's "list," were openly hostile to Trimble at times, were opposed to the anticipated changes at the station as evidenced in part by the incident at Shooters bar, and were generally a part of "Keatley's team." And, of course, Gee again points to the alleged complaint against Matthews as the "last straw" cause of his termination. For the reasons already discussed, the Board's rejection of Gee's proffered "last straw" reason for terminating Matthews is supported by substantial evidence. We are equally satisfied that the Board's rejection of Gee's claim concerning the other alleged reasons for terminating the four discriminatees is supported by substantial evidence.

We recognize that the work environment at WXGI prior to the union-organizing activities was an unsettled one, and that at least two of the four discriminatees feared possible termination primarily because of Gee's decision, announced in early September, that he would be rehiring the disliked Trimble. Indeed, there appears to be little dispute that this fear prompted Matthews and Giles to begin a union-organizing campaign and to solicit their close friends and colleagues, Shannon and Southworth, to support their cause.

Contrary to Gee's assertion, however, the evidence does not compel a finding that these men ran to the union because they knew they were going to be fired for other reasons. Rather, the evidence supports the finding that Gee had rejected Trimble's recommendation that the station give all four discriminatees, and nearly every other on-air personality, a two-week notice in mid-September of their termination, and that no terminations had taken place prior to the beginnings of the union-organizing activities. Indeed, Gee's own actions and words indicated a contrary intent to keep all four of the discriminatees on as employees in at least some capacity. For example, Gee had engaged in express negotiations with Shannon for his continued employment, and had an outstanding written offer for an employment contract with Shannon which was never withdrawn. Similarly, Gee clearly intended to retain Matthews in his employment after the transfer of ownership and had engaged in discussions with Matthews to this effect as well. Gee admitted that the light was still "green" for Matthews' employment after the Shooters' incident, and none of the four discriminatees' termination letters referenced the purported "rebellion." Despite all indications that the four men would be retained by Gee Communications' WXGI AM-950 radio station in at least some capacity, all four employees were abruptly terminated without notice and within days of Matthews' and Giles' open efforts to organize the employees. The fact that Shannon and Southworth were not as involved in the unionizing effort is of little consequence. Gee admitted that the four discriminatees were viewed as a clique and, in any event, the Board need not show that the employer knew of any particular employee's union involvement to show that the employer acted out of union animus. *See NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991).

We are also unpersuaded by WXGI, Inc.'s and Gee Communications' claim that the Board did not adequately consider the fact that

Gee Communications did not terminate one employee who was a member of AFTRA, the Screen Actors Guild/AFL-CIO, and that the Union at issue was the station's biggest advertiser. However, Gee Communications' failure to terminate a single-member employee of a union tells us virtually nothing about how Gee felt about an organizing campaign for exclusive representation, nor is "discriminatory motive, otherwise established, . . . disproved by an employer's proof that it did not weed out all union adherents." *NLRB v. Instrument Corp. of America*, 714 F.2d 324, 330 (4th Cir. 1983) (internal quotation marks omitted). Also, prior to any union-organizing activities, the Union had made it clear that it wanted Shannon to handle its account and that it would increase its business if Shannon were allowed to do so. By terminating Shannon, whatever the motivating factor, Gee alienated the Union and could very well have determined that the price of the Union's account was worth staving off a unionized workplace. Accordingly, we conclude that the Board's finding that Gee's decision to terminate the four men was motivated by anti-union animus and not by legitimate business reasons is supported by substantial evidence in the record.

### III.

Having determined that substantial evidence supports the Board's findings that WXGI, Inc. violated the Act, we turn to address the assertion that the Board erred in finding that Gee Communications was a "successor" to WXGI, Inc., jointly and severally liable under the Board's Order.

### A.

It has long been settled that the "purchaser of a business, who acquires and continues the business with knowledge that his predecessor has committed an unfair labor practice in the discharge of an employee, may be ordered by the [Board] to reinstate the employee with backpay." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 170 (1973). Such "successorship" cases are "primarily factual in nature." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987). The Board, reviewing "the totality of the circumstances of a given situation, . . . focus[es] on whether the new company has 'acquired substantial assets of its predecessor and continued, without

interruption or substantial change, the predecessor's business operations.'" *Id.* (quoting *Golden State*, 414 U.S. at 184); *see also NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 819 (4th Cir. 1990).

> Hence, the focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Fall River*, 482 U.S. at 43; *see also General Wood*, 905 F.2d at 819. The Board also considers the employees' perspective, *i.e.*, "whether 'those employees who have been retained will understandably view their job situations as essentially unaltered.'" *Fall River*, 482 U.S. at 43 (quoting *Golden State*, 414 U.S. at 184). In reviewing the Board's determination of successor liability, we review the Board's findings to ensure that they are supported by substantial evidence. *See General Wood*, 905 F.2d at 819. "[W]e must defer to the [Board's] application of successorship principles so long as it is rational and not inconsistent with the Act." *Holly Farms Corp. v. NLRB*, 48 F.3d 1360, 1366 (4th Cir. 1995) (internal quotation marks omitted).

### B.

In light of Gee's position with WXGI, Inc., and later with Gee Communications, Gee Communications understandably offers no opposition to the Board's finding that Gee Communications acquired and continued the business with knowledge of the alleged unfair trade practices. Gee, the owner and highest official of Gee Communications, personally made the decision to and did terminate the four discriminatees. Thus, substantial evidence clearly supports this finding.

Gee Communications does, however, contest the Board's finding that there was no substantial change in personnel, format, music style, facilities, or management when Gee assumed control of the station on October 17, 1997. Asserting that there was instead "massive evidence

[of] substantial change" at the radio station, Gee Communications points to the fact that it moved administration and accounting to the same location as the station; made building improvements, such as purchasing a new air conditioner, improving the parking lot, and replacing windows; made a number of "high-tech" upgrades to the station's equipment; established longer hours of broadcasting; imposed a more structured on-air and format schedule; and improved employee benefits and relations. In addition, Gee Communications points to testimony that David Gee participates more actively in the daily operation of the station than did Keatley, and that Gee Communications' new manager, Trimble, has been given more control than that possessed by WXGI, Inc.'s general manager before him. Finally, Gee Communications points to evidence that, although it did continue operation of country music radio station WXGI AM-950, the country music format was changed from "traditional" or "legendary" country music to "modern" country music and testimony that Shannon believed this to be a substantial change.

We are unpersuaded by these relatively minor changes in the operation of country music radio station WXGI AM-950. When Gee Communications assumed ownership of the radio station from WXGI, Inc. on October 17, 1997, it clearly brought to the business new ideas for improving the station and its relations with the employees. However, the Board's finding that the changes did not alter the essential nature of the employees' jobs, *see Fall River*, 482 U.S. at 44, and were not substantial considering the totality of the circumstances, is amply supported by the record.

Gee Communications continued to operate a radio station with the same call numbers (WXGI AM-950) under the same FCC license from the same physical facility, broadcasting country music to the same radio market with many of the same on-air personalities. Management of the station prior to the transfer of ownership was handled for WXGI, Inc. by David Gee. Management of the station for Gee Communications remained primarily with David Gee when his company completed the purchase. In fact, WXGI, Inc. and Gee Communications acknowledge that Gee remained "hands-on," despite his employment of Trimble. At best, Gee Communications established that it made some changes and upgrades to the station, but changes of this type and magnitude would be expected whenever new manage-

ment continues an existing business. And, while we appreciate the opinion of WXGI's former on-air country music personality concerning the distinctions in country music, as well as the distinctions themselves, this relatively minor change in the totality of the circumstances can hardly form the basis for a determination that Gee Communications did not "continue[ ], without interruption or *substantial* change, the predecessor's business operations." *Fall River*, 482 U.S. at 43 (internal quotation marks omitted) (emphasis added). Accordingly, we are satisfied that substantial evidence supports the Board's finding that Gee Communications was a successor to WXGI, Inc. for purposes of the Act because the business, specifically radio station WXGI AM-950, was continued without interruption or substantial changes, and that the Board properly applied the controlling law to the facts before it.[6]

## IV.

For the foregoing reasons, we deny WXGI Inc's and Gee Communications, Inc.'s petition for review and grant the Board's cross-petition for enforcement.

*PETITION FOR REVIEW DENIED AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

---

[6]WXGI, Inc. and Gee Communications have also advanced an argument, seemingly for the first time on appeal, to the effect that the Board also lacked jurisdiction over the "new" WXGI because WXGI is now only the landlord to the station and is no longer in the radio business. Of course, WXGI is no longer in the radio business because it sold the station and assigned the FCC license to Gee Communications. But, WXGI, Inc. operated the station and was the employer of the discriminatees at the time the unlawful terminations were made, rendering it liable under the Board's order. WXGI, Inc. has advanced no argument that the "new" WXGI, Inc. is in fact a different company from the "old" WXGI, Inc.