RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAYTON NEWSPAPERS, INC., d/b/a COX PUBLISHING
OF OHIO,

        *Petitioner/Cross-Respondent,*

    *v.*

NATIONAL LABOR RELATIONS BOARD,

        *Respondent/Cross-Petitioner,*

GENERAL TRUCK DRIVERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS LOCAL UNION NO.
957,

        *Intervenor.*

Nos. 03-1981/2110

On Petition for Review and Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 9-CA-36894; 9-CA-36981; 9-CA-37385.

Argued: September 14, 2004

Decided and Filed: March 23, 2005

Before: BOGGS, Chief Judge; GUY, Circuit Judge; and STEEH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Brett L. Thurman, Dayton, Ohio, for Petitioner. Steven B. Goldstein, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. John R. Doll, LOGOTHETIS, PENCE & DOLL, Dayton, Ohio, for Intervenor. **ON BRIEF:** James M. Hill, McNAMEE & HILL, Beavercreek, Ohio, Leslie H. Wiesenfelder, DOW, LOHNES & ALBERTSON, Washington, D.C., for Petitioner. Steven B. Goldstein, Margaret A. Gaines, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. John R. Doll, LOGOTHETIS, PENCE & DOLL, Dayton, Ohio, for Intervenor.

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

BOGGS, Chief Judge.  This is a case of one-upmanship gone wrong.  A union called a one-day strike in order to push management into more active bargaining, and the management reacted by locking out the union and laying off some of its members.  The lockout dragged on for months, resulting in a finding by the NLRB that the company had committed multiple unfair labor practices including threatening the strikers with loss of their jobs, dealing directly with the strikers, failing to reinstate the strikers after an unconditional offer to return, failing to pay a bonus, and laying-off and failing to recall the laid-off workers.  Appellant seeks review of the NLRB order; the NLRB seeks enforcement.  We affirm the NLRB with regard to the unfair labor practices stemming from the strike and lockout and the failure to pay the bonus but reverse the NLRB's holdings regarding the laid-off workers.

**I**

Appellant, Dayton News, Incorporated (DNI), is the publisher of the *Dayton* (Ohio) *Daily News*.  The Charging Party, Local 957 of the Teamsters-affiliated General Truck Drivers, Chauffeurs, Warehousemen and Helpers Union (the Union), is a bargaining unit made up of drivers and maintenance workers.  The drivers' job is to pick up the newly-printed newspapers at the *Daily News* facility and deliver them to various distribution points in the area.  A daily newspaper is a highly perishable commodity.  If it is not delivered on time, it becomes worthless.

On the night of Saturday, June 26, 1999, the Union called a one-day "quickie" strike.  DNI managed to get the Sunday paper out that night, but it refused the Union's subsequent offer to return to work Sunday night and locked the drivers out.  The lockout continued into 2000, despite an additional Union offer to return to work in late December 1999.  The unfair labor practices charged by the Union all stem from the strike and lockout.

Prior to and after the strike, the relationship between the newspaper and the Union was affected by two important developments.  First, DNI was building a new printing facility outside Dayton to replace its downtown building.  In the Spring of 1998, DNI notified the Union that the new facility would necessitate some changes in operations and in the number of drivers needed.  In the old facility, the dock area only had space to load 12-foot trucks.  The new facility would be able to handle 45-foot trucks, so delivery runs could be consolidated.  As a consequence, DNI planned to lay off the thirteen least-senior drivers, retaining eighteen drivers.  DNI notified the Union of these layoffs on January 18, 1999.

Also in early 1999, DNI offered all of its employees who would lose their jobs as a result of the move to the new facility, including the thirteen least-senior drivers, a Stay-to-the-End Bonus of up to $10,000.  The Bonus was contingent on the employees "staying actively at work, and in good standing, until their release date."  The company tentatively planned to begin laying off workers in July 1999 and intended to release employees gradually.

The second important development that affected labor-management relations was unfruitful negotiations over a new contract.  The Union's collective bargaining agreement with DNI expired on November 15, 1998.  The two sides had been in talks since August 1998 and appeared to have reached an agreement by the end of November.  The Union scheduled a ratification vote for November 30, 1998, but at the last minute, and despite promises made to DNI by lead negotiator John Burns, Vice President of the Union's Executive Committee and Local 957's business representative, the Union's Executive Committee cancelled the vote.  The record does not indicate why the vote was cancelled, although apparently Burns told the drivers that DNI had "changed the

deal," a claim the ALJ later found to be untrue.  After this, the two sides continued to negotiate but only in a desultory manner–meetings were scheduled once a month but many were cancelled.

In May 1999, the Union voted to authorize a strike but did not notify DNI of this.  DNI Operations Manager, Michael Joseph, only found out about the possibility of a strike in mid-June when a driver "blurted" it out during a meeting about the transition to the new facility.  There is some dispute about how Joseph reacted.  One driver, Tim Hehemann, testified that Joseph threatened the drivers with the loss of their jobs if they went on strike,[1] but another driver testified differently:

> Q.  And you said that Mike responded that that [striking] would be a mistake?
> A.  Yes, sir.
> Q.  Okay.  And isn't it true that at no time did Mr. Joseph say that striking employees would be fired?
> A.  Yes.
> Q.  That's correct?
> A.  He did not say that.  I did not hear nothing about any threats, or anything.

The ALJ, however, chose to credit Hehemann's statement.

At 10:00 p.m. on Saturday, June 26, 1999, without notifying DNI, the Union went on strike, setting up picket lines at the DNI headquarters downtown, at the new printing facility, and at the Penske lot where the delivery trucks were parked when not in use.  Most of the drivers scheduled to work that night were the least senior ones; the three senior drivers who were scheduled all crossed the picket line.  John Burns, the Union business representative, testified that he timed the strike with an eye toward maximum impact, because the Sunday paper is DNI's most profitable of the week.  The Union's stated intent was to prevent the newspapers from going out, and to this end picketers blocked the exits at the Penske lot and the entry to the downtown building with their bodies.  DNI had to call the police to clear the picketers away, and after each truck left, the picketers returned, and the police had to clear them out again.  The paper got out, but the deliveries were delayed.  According to the testimony of several drivers and other Union representatives present at the picket lines, a furious Michael Joseph told the drivers that the Union had "cost all you guys your jobs."

On Sunday, June 27, the Union sent notice to DNI indicating the drivers' unconditional intention to return to work that evening.  As each driver showed up for his shift, however, Joseph sent him home, saying that DNI was "not in need of 957's services," and that the drivers would be contacted about when they should return to work.  When drivers asked if their work was unsatisfactory, Joseph told them he was happy with them, it was the Union and its representatives with which he had the problem.

During the week following the strike, Joseph contacted the eighteen drivers who would be employed at the new printing facility and asked to speak to each of them individually.  About a dozen drivers accepted his offer.  In the meetings, he explained that he would welcome back any driver who promised to show up for work, *i.e.*, not to strike.  He also discussed the contract negotiations and the fact that working drivers might have to cross the picket line.  Nine drivers eventually went back to work.  DNI did not notify the Union that it was holding these meetings, did not permit a Union representative to be present, and did not first discuss with the Union the issues to be raised in the meetings.

---

[1] "He said, well, you don't want to do that and, you know, basically, we were saying, well, it's going to happen. He said you definitely don't want to strike, and I asked him, I said, well, what would happen?  And he said, well, you won't be working here any more, and that would be it for you."

On July 1, 1999, DNI declined the Union's June 27 offer to return to work and formally notified the Union and the drivers that it was putting the eighteen senior drivers on unpaid leave and laying off the thirteen least-senior drivers. The senior drivers who accepted DNI's conditions were permitted to return to work. DNI also eventually refused to pay the Stay-to-the-End bonus to the laid-off drivers.

Simultaneously, DNI expedited the transfer to the new printing facility. The strike forced it immediately to find a way to reduce its routes down to the eighteen it had planned to implement after the transition. Among other efficiency measures, DNI began to use the 45-foot trucks for some of its deliveries. These trucks required drivers to have a Class A Commercial Driver's License, which had not been necessary to drive the older 12-foot trucks. To cope with the lockout, DNI also hired replacement drivers. Although it did not recall any of the least-senior, laid-off drivers, it did rehire at least one of them as a new employee.

On July 19 and again on August 9, 1999, DNI met with the Union to try to negotiate an end to the lockout and a new contract. DNI demanded that the Union give "work assurances" until the transition to the new facility was complete. Not even DNI officials seemed completely sure what they were asking for. DNI told the Union, "[f]or now, as an opening proposition, we are asking for some assurances that work and new plant transition can continue with little or no interruption until the transition is complete–after that, some type of advance notice (a few weeks might be enough, maybe less) before striking would be required." In addition, DNI asked the Union to accept the operational changes that had been made as a result of the expedited transfer. The company stated bluntly that it would not return to the less efficient delivery procedures of the past and that it did not want the drivers to return and to start filing complaints with the NLRB because of the new operations.

When the Union negotiators asked DNI to describe the operational changes, the company was reluctant to do so, but eventually offered what it called a partial list of nine changes that had already taken place or were immediately anticipated. DNI did not explain what other changes it was expecting, telling the Union the drivers would have to accept the operation "as is" on the day they returned to work. However, the expedited move had thrown DNI off its original transfer plan, lending some credibility to the company's claims that it could not detail the future operational plans to the Union with any precision.

Over the course of the summer, the Union filed a series of unfair labor practice charges with the NLRB. In late December 1999, the Acting Regional Director of the NLRB notified the parties that he was refusing to issue a complaint on the charges that DNI unlawfully locked the Union out, that it unlawfully changed working conditions of the thirteen most-senior drivers with jobs guaranteed for life, or that it made unlawful unilateral changes in operating procedures during the transition period. On April 14, 2000, the NLRB General Counsel upheld these findings on appeal.

On December 23, the Union made what it called an unconditional offer to DNI to return to work:

> on the same terms and conditions and with the same guarantees and promises as those drivers the Company had permitted to return to work since July 1, 1999. To ensure that there is no misunderstanding about this unconditional offer, Local 957 and the individual drivers locked out by DNI . . . [who] have not returned to work agree to return to work with the same assurances that there would be no work stoppages, strikes or other slowdowns for the same period of time agreed to by the locked out drivers that the Company has allowed to return to work, and providing the same notification agreed to by those same locked out drivers that the Company allowed to return to work.

> This unconditional offer to return to work as set forth above is continuing in nature and the locked out drivers who have not yet been allowed to return to work are willing and able to return to work at any time in the future beginning from the date of this letter forward[].

DNI chose to treat this offer not as an unconditional expression of the Union members' willingness to return to work but rather as an offer to negotiate.

On December 27, 1999, DNI sent a letter to the Union listing a number of reasons why the company could not bring the old drivers back immediately and a series of changes that had occurred in the operations of the newspaper that made negotiations with the Union more complicated. These included: the near-completion of the transition to the new facility, unnamed union unfair labor practices, unnamed union criminal acts, the union's position in a state court filing that it had no control over the actions of the locked-out employees, the hiring and training of replacement workers, changes in the bargaining strength of the unit, and continued operational changes at the new facility. DNI also claimed that the Union made insufficient work assurances and asked whether the Union could provide some kind of collateral in case the returning workers did not do what the Union promised.

The Union responded immediately, pointing out that most of DNI's claims were either irrelevant or spurious, and asking again that the company contact the locked-out drivers about returning to work. DNI did not make itself available to negotiate until February 4, 2000, and at that meeting continued to contend that it could not trust the Union or the drivers. DNI also focused the discussion on the issues of back pay and contract negotiations.

On November 14, 2000, an ALJ issued a decision finding DNI in violation of several provisions of the NLRA: i) threatening the drivers with loss of their jobs if they went on strike, in violation of § 8(a)(1); ii) dealing directly with the drivers, in violation of § 8(a)(5) and (1); iii) unlawfully continuing the lockout after December 27, 1999, in violation of § 8(a)(3) and (1); iv) unlawfully laying off drivers and failing to recall them, in violation of § 8(a)(3) and (1); and v) failing to pay the Stay-to-the-End Bonus, in violation of § 8(a)(3) and (1). On July 14, 2003, a panel of the NLRB upheld the ALJ's findings of fact and law, though in several instances on different legal theories. The NLRB issued a cease-and-desist order for each unfair labor practice it found, ordered DNI to reinstate all of the locked-out and laid-off workers with back pay, pay the Stay-to-the-End Bonus with accrued interest, make the usual cleansing of the personnel records, and post the usual notices. DNI petitions for review of the Board's decision, and the Board files a cross-application for enforcement of its order.

## II

This court reviews the NLRB's legal conclusions *de novo*. *Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir. 2003). The Board's findings of fact, however, are upheld "if supported by substantial evidence on the record." *Kamtech, Inc. v. NLRB*, 314 F.3d 800, 807 (6th Cir. 2002) (citing NLRA § 10(e) and (f), 29 U.S.C. § 160(e) and (f)). Substantial evidence consists of "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003) (quoting *DuPont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002)) (internal citations omitted). Facts are weighed in view of the record as a whole. NLRA § 10(e), 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Under this standard, the reviewing court must defer both to reasonable inferences drawn by the Board from the facts before it and to the Board's assessment of the credibility of witnesses. *Fluor Daniel*, 332 F.3d at 967; *Kamtech*, 314 F.3d at 807; *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) ("Deference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting testimony and

essential credibility determinations have been made.'") (quoting *NLRB v. Nueva Eng'g, Inc*., 761 F.2d 961, 965 (4th Cir. 1985)).   Therefore, this court cannot set aside, in favor of its own interpretation, NLRB findings that are supported by substantial evidence. *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997).  However, the NLRB's findings can be set aside if "the record demonstrates that the Board's decision is not 'justified by a fair estimate of the worth of the testimony of witnesses' or by the Board's 'informed judgment on matters within its special competence or both.'" *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999) (quoting *Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985)).

## III

We first consider the Board's findings regarding the three alleged unfair labor practices stemming from the strike and lockout:  (1) that DNI used the threat of job loss to coerce the drivers prior to, during, and after the strike;  (2) that DNI dealt directly with the union members when it held one-on-one meetings after the June 26 strike; and (3) that the lockout became unlawful after the Union's offer in December 1999 to return to work.  We affirm the Board and grant enforcement of its order on each of these findings.

### 1)      Coercion

Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" to organize, join or assist unions, bargain collectively, and engage in collective action. 29 U.S.C. § 158(a)(1); *see also* NLRA § 7, 29 U.S.C. § 157.  A section 8(a)(1) violation occurs when substantial evidence demonstrates that the employer's statements, considered from the employees' point of view, had a reasonable tendency to coerce. *Beverly Health & Rehab. Servs. v. NLRB*, 297 F.3d 468, 476 (6th Cir. 2002); *Peabody Coal v. NLRB*, 725 F.2d 357, 363 (6th Cir. 1984).  The union does not have to demonstrate actual coercion. *Torbitt & Castleman,* 123 F.3d at 907.

Statements, even those that imply negative views of unionism, are not coercive if they express a reasonable belief based on objective facts beyond the employer's control or that describe management decisions made prior to the union action. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618-19 (1969).  By contrast, statements that imply that the "employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him" constitute impermissible coercion if, taken from the employees' point of view, they suggest that economic reprisals will follow union activity. *Ibid*.  Thus, for example, threatening employees with loss of employment or other adverse consequences should they strike, or trying to induce employees to rid themselves of the union by promising they would be better off without it are well-established violations of § 8(a)(1). *NLRB v. Flex Plastics, Inc*., 726 F.2d 272, 276 (6th Cir. 1984) (employer unlawfully undermined union by telling employers they could get better deal without it); *Sedloff Publ'ns, Inc*., 265 NLRB 962, 969 (1982) (employer unlawfully suggested to picketers that problem could be resolved if they dropped union and returned to work).

In assessing the coercive impact of the employer's statements, we defer to the NLRB's judgment and expertise. *Gissel*, 395 U.S. at 620; *Beverly Health*, 297 F.3d at 476.  The Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. NLRA § 10(e), 29 U.S.C. § 160(e).

In the present case, the Board found that DNI tried impermissibly to coerce employees in two instances.  First, prior to and during the June 26 strike, Operations Manager Joseph threatened the drivers with the loss of their jobs if they struck.  For example, when he learned of the strike vote, he warned the drivers that if they struck, they "won't be working here anymore," and during the strike he told the Union Vice President, "you just cost all these guys their jobs."  Second, after the strike, Joseph told the drivers that the Union was not representing their best interests.  When the

drivers tried to return to work, he turned them away, explaining he had no problem with them but rather with the Union and that as long as the Union represented them, he did not believe the conflict could be resolved.

The Board found, and we agree, that the drivers understood such statements to be coercive and to imply that their exercise of their § 7 rights would lead to economic reprisals. It also found that the management was not expressing reasonable objective beliefs based on objective facts or decisions made prior to learning of the Union's intent to strike.

Appellant argues that the ALJ mistakenly credited driver Hehemann's testimony that during a meeting in mid-June Joseph threatened the drivers with job loss if they struck. No other driver testified to hearing the threat, and one driver testified specifically that he did not hear it. In addition, Appellant points out, the ALJ discredited Hehemann's testimony that the picketers did not block trucks from entering and leaving during the strike. The implication Appellant wishes us to draw is that if Hehemann was unreliable in one part of his testimony, he was unreliable in all of it. The ALJ, however, chose to credit Hehemann's testimony about Joseph. It is well settled that reviewing courts will only overturn credibility assessments of the ALJ, who saw the witness testify, only if the assessments have no rational basis. *See, e.g.*, *Fluor Daniel*, 332 F.3d at 967; *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002); *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 225 (6th Cir. 2000). The ALJ made his assessment of Joseph's comments about the strike and the Union in light of Joseph's statements during and after the strike, in light of Joseph's failure to testify about what he said at the meeting, and in light of the ALJ's discrediting of Joseph's testimony that he did not discuss strikes or crossing the picket line in his one-on-one meetings with the drivers. We cannot displace the Board's choice to accept the ALJ's credibility assessment unless we find it unsupported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951). We do not so find, and therefore we affirm the Board's holding.

### 2)    Direct Dealing

NLRA § 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with the employees' representatives. 29 U.S.C. § 158(a)(5). That section incorporates by reference § 9(a), which makes the bargaining unit representatives the exclusive representative of the employees "for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). Thus, employers may not go directly to employees, who have not repudiated their union, and bargain with them on matters covered by the collective bargaining agreement. *NLRB v. Goodyear Aerospace Corp.*, 497 F.2d 747, 752 (6th Cir. 1974); *see also NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) ("only the union may contract the employee's terms and conditions of employment . . . .").

An employer may communicate directly with its employees only "if such expression contains no threat of reprisal or force or promise of benefit," NLRA § 8(c), 29 U.S.C. § 158(c); *Gissel Packing*, 395 U.S. at 618, and only when doing so is not "likely to erode 'the Union's position as exclusive representative.'" *Allied-Signal, Inc.*, 307 N.L.R.B. 752, 753 (1992) (quoting *Modern Merch.*, 284 N.L.R.B. 1377, 1379 (1987)). Furthermore, when the statements themselves constitute unfair labor practices, for instance because they disparage the union, hold the employer out as the employees' protector, or undermine the union by changing employment conditions treated in the collective bargaining agreement, direct dealing is presumed. *NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp.*, 789 F.2d 121, 134-35 (2d Cir. 1986); *see also Henry Bierce Co. v. NLRB*, 23 F.3d 1101, 1109 (6th Cir. 1994) (polling employees without informing union about poll is direct dealing); *NLRB v. M.A. Harrison Mfg. Co.*, 682 F.2d 580, 582 (6th Cir. 1982) (bypassing Union by directly soliciting employee views on an insurance plan is direct dealing); *NLRB v. Roll & Hold Warehouse & Distribution Corp.*, 162 F.3d 513, 519 (7th Cir. 1998) (finding company undermined union by presenting plan to employees before notifying union); *Safeway Trails, Inc. v. NLRB*, 641

F.2d 930, 932-33 (D.C. Cir. 1979) (finding § 8(a)(5) violation when employer told employees that union was to blame for state of negotiations).

We agree with the Board that DNI dealt directly with the union drivers. DNI requested individual meetings with the drivers without informing the Union of the meetings, without discussing the relevant issues with the Union first, and without permitting the Union to have a representative present at the meetings. During the meetings, Joseph discussed what DNI considered an acceptable work commitment from the drivers, including a commitment not to strike during the transition. In the meetings, Joseph also suggested that it was the Union negotiators who had caused the problems and that the drivers would be better off dealing with DNI directly. Through these meetings, DNI succeeded in prying employees loose from the Union, as nine of the eighteen senior drivers eventually agreed to return to work on the conditions Joseph specified. At least one driver resigned from the Union prior to returning to work.

DNI contends that it did no more than what the NLRB found acceptable in *U.S. Ecology Corp.*, 331 N.L.R.B. 223 (2000), *enf'd*, 26 Fed. Appx. 435 (6th Cir. 2001) (unpublished). In that case, the company sent letters to striking workers in response to questions from the workers about how they could return to work. The letters stated that "for the time being" they could return at the pre-strike wage and benefits levels. The company did not send the letter to the Union. The Board found that when the company responded to workers' requests for information by stating the only employment conditions the company lawfully could offer, the company did not tend to erode the Union's position as exclusive bargaining representative. *Id.* at 226. *U.S. Ecology* is distinguishable from the present case because DNI initiated contact with the workers, and it proposed to them working conditions, in particular a waiver of the right to strike, different from those in effect before the strike. These factors convince us that DNI's actions would have tended to erode the Union's position, and we therefore affirm the NLRB and grant enforcement.

### 3)      Unlawful Lockout

In December 1999, the General Counsel found that DNI had lawfully locked out the Union on July 1 because the potential for future "quickie" strikes would substantially harm its ability to get its newspapers delivered and because the Union would not agree to refrain from such strikes during the transition period. On December 23, 1999, the Union "unconditionally" offered to return to work on the same terms as those workers who had returned in July. However, on December 27, DNI refused to accept this offer and continued the lockout. As a consequence of this refusal, the NLRB found that as of December 27, 1999, DNI was engaged in an illegal lockout.

An employer violates NLRA § 8(a)(3) and (1) if it fails to reinstate striking workers without showing a legitimate and substantial business justification. *NLRB v. Fleetwood Trailers*, 389 U.S. 375, 378 (1967); *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34 (1967). An employer may lawfully lock out employees to prevent losses in the face of repeated "quickie" strikes or to pressure the Union to accept the employer's legitimate bargaining position, *International Shoe Co.*, 93 N.L.R.B. 907 (1951); *American Ship Building Co. v. NLRB*, 380 U.S. 300 (1965), as long as the employer conducts the lockout in a manner "reasonably adapted to achieve legitimate business ends or to deal with business exigencies . . . ." *NLRB v. Brown Food Store*, 380 U.S. 278, 287-88 (1965). To be reasonably adapted to achieve legitimate business ends, the "employer's conduct throughout the lockout must be consistent with the advancement of its legitimate bargaining position so that the employees are able to 'knowingly reevaluate their position.'" *Anchor Concepts, Inc.*, 323 N.L.R.B. 742, 745 (1997) (quoting *Eads Transfer, Inc.*, 304 N.L.R.B. 711, 712 (1991)). The employees must know at any point in the lockout what they can do to end it.

The Board found that, while DNI was entitled to sufficient assurances from the Union to protect its business interests, its response to the Union's December 23 offer failed to provide the

Union with information about how it could end the lockout.  DNI had never answered the Union's September 13 request for a description of all the operational changes it implemented as part of the move to the new facility.  Thus the Union's December 23 letter could not have been more specific about the changes it was willing to accept.  In its December 27 response, DNI failed to remedy the information gap, alluding instead to the time pressures caused by the imminent possibility of Y2K disaster, the locked-out drivers' lack of training in the new operations, unnamed operational changes, and the replacement workers' training.  Admittedly, DNI also mentioned, without explaining, more relevant bargaining matters such as the Union's failure to offer "collateral" for its promise not to strike, and the Union's failure to agree to the specific work assurances DNI wanted.  Nonetheless, the Board found that DNI failed to meet its burden of proving a legitimate business justification for its refusal to reinstate the striking workers and that DNI failed to ensure that the Union could knowingly evaluate its position.

We believe that the Board, which has the primary responsibility for balancing management's business needs with the workers' right to be reinstated, *Fleetwood Trailer*, 389 U.S. at 378, did not err in finding that after December 27, DNI's demands became a "moving target" that made it ever more difficult for the Union to knowingly evaluate its position and end the lockout.

**IV**

We next turn to the three unfair labor practices that the Board found to stem from the layoff of the thirteen least-senior drivers.  We believe that the Board erred in holding that DNI violated § 8(a)(3) and (1) of the NLRA by laying off and then failing to recall these drivers.  However, we grant enforcement of the Board's finding that DNI must pay them their Stay-to-the-End bonus.

*1)      Layoffs*

The Board found that DNI violated NLRA § 8(a)(3) and (1) by failing to reinstate, laying off, and failing to recall the thirteen least-senior drivers.  We are not persuaded that the Board's holding is supported by substantial evidence. *Universal Camera*, 340 U.S. at 488 ("[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."); *Integrated Health Servs. v. NLRB*, 191 F.3d 703, 706 (6th Cir. 1999); *Fleming Cos. v. NLRB*, 349 F.3d 968, 972 (7th Cir. 2003).

The Board's opinion concerning the treatment of the thirteen least-senior drivers found two of DNI's actions to be unlawful.  First, it held that DNI showed no legitimate and substantial business justification for failing to reinstate these thirteen drivers on July 1.  Second, it found that DNI laid off the drivers in retaliation for the strike.  We will analyze each point in turn.

The Union went on strike on June 26.  The next day, it notified DNI that the strike was over, and the drivers showed up for work that evening.  At that point, the strike ended. *See Independent Fed'n of Flight Attendants v. Trans World Airlines, Inc.*, 819 F.2d 839, 847 (8th Cir. 1987) (finding "strike ended when the Union unconditionally offered to return to work."); *Eazor Express, Inc. v. Int'l Bhd. of Teamsters*, 520 F.2d 951, 966 (3d Cir. 1975) (finding strike ended when the striking employees returned to work).  As the drivers arrived for their shift, DNI sent them away.  With this act, DNI locked out all the drivers.  The lockout did not simply begin with the July 1 formal refusal of the Union's offer to return to work or the lockout letter sent to the eighteen senior drivers.  If the strike was over, and the drivers were not working because DNI would not permit them to work, then we can conceive of no other legal status for the drivers than "locked out."

Although the NLRA does not define the term "lockout," it is generally taken to refer to "the withholding of employment by an employer from its employees for the purpose of either resisting

their demands or gaining a concession from them." 2 Patrick Hardin and John E. Higgins, Jr., *The Developing Labor Law* 1523 (4th ed. 2001); 48A AM JUR 2D *Labor and Labor Relations* § 3571 ("A lockout occurs when an employer discontinues all or a portion of its operations or refuses to allow employees to work for the purpose of bringing pressure upon the union.")   Preventing employees from working in response to intermittent or quickie strikes has long been acknowledged as constituting a lockout. *International Shoe*, 93 N.L.R.B. 907.

Furthermore, the Union's original charge against DNI contended that "[o]n or about June 27, 1999 [DNI] has discriminated in regard to the tenure of employment of all of the drivers employed by the Employer . . . by locking them out . . . ."  When the Acting Regional Director and the General Counsel ruled on this complaint, they found that "the employer had a legitimate business justification for engaging in the lockout . . . ."  Nothing in the Union's complaint, the Acting Regional Director's initial findings, or the General Counsel's review of those findings indicate that anyone believed that the lockout began on July 1 or that it included only the eighteen drivers formally notified of the lockout on that date.  Consequently, we find that the thirteen least-senior drivers were locked out from June 27-July 1, 1999.

As of July 1, DNI changed the status of the thirteen least-senior drivers from locked out to laid off.  The Board held that at this time DNI should have reinstated the laid-off drivers because DNI needed more drivers than it had, so it had work for the laid-off drivers to do.  We find that this statement inaccurately reflects the state of affairs at DNI on July 1.  DNI testified that between June 27 and July 1, it expedited its transition process and consolidated its delivery runs down to the 18 it had planned to institute after the move to the new facility.  As it was this consolidation that was to have caused the thirteen drivers to lose their jobs, their release date had effectively arrived, and DNI had the right, under the notice it gave long before the strike, to lay off the least-senior drivers. DNI's need to hire replacement workers to fill those 18 runs arose from the fact that it had locked out some of the most-senior workers who were supposed to have staffed them.  Moreover, the recall of laid-off workers is governed by the collective bargaining agreement not the NLRA, and the agreement between DNI and the Union was no longer in force.**2**

Assuming, *arguendo*, that the Board was correct in finding that DNI should have reinstated the least-senior drivers because they were economic strikers who had made an unconditional offer to return to work, we do not agree that DNI failed to meet its burden of showing a legitimate and substantial business justification for not doing so. *Fleetwood Trailer*, 389 U.S. at 378; *Laidlaw Corp.*, 171 N.L.R.B. 1366, 1368 (1968).  The strike caused DNI to expedite its transition and eliminate the jobs of the laid-off drivers.  The Board does not dispute that DNI had a legitimate and substantial business justification for consolidating its runs.  Even with only eighteen runs, DNI still had vacancies due to the continued lockout of a number of the most senior drivers.  However, a striking worker does not have to be recalled to an opening for which he or she is qualified unless that vacancy is created by the departure of replacements from the striker's former job. *Rose Printing Co.*, 304 N.L.R.B. 1076, 1079 (1991).  As part of the process of reducing its runs, DNI went to larger trucks requiring a Class A Commercial Driver's License, changed its routes, and made other operating adjustments.  Therefore, the jobs available on July 1 were not the jobs the laid-off drivers had left, and DNI had no obligation to recall them to merely similar jobs.

The Board also found that the layoffs were unlawful under a *Wright Line* analysis. 251 N.L.R.B. 1083, 1089 (1980).  The *Wright Line* test places the burden on the General Counsel to make a *prima facie* showing, by a preponderance of the evidence, that the employer's action was motivated, at least in significant part, by anti-union animus.  The employer then bears the burden of making the affirmative defense, by the preponderance of the evidence, that the act was motivated

---

**2**If it had been in force, the initial strike would have violated the CBA's no-strike clause.

by a substantial business justification, such that the employee would have been dismissed even if the protected concerted activity had not taken place. *Ibid*.; *NLRB v. Transp. Mgmt. Corp*., 462 U.S. 393 (1983) (adopting the *Wright Line* test); *Bowling Transp., Inc. v. NLRB*, 352 F.3d 274, 283 (6th Cir. 2003). To meet its initial burden, the General Counsel needs to demonstrate that the employee was knowingly engaged in a protected activity, that the employer knew of the activity, and that the employer's action resulted from anti-union animus. *Kamtech*, 314 F.3d at 811 (citing *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777-78 (6th Cir. 2002)).

The ALJ and NLRB found that the General Counsel had established his *prima facie* case for DNI's unlawful motivation. We disagree. While it is true that DNI tried to coerce the drivers out of striking and threatened them when they did, we look also to the Acting Regional Director and General Counsel's findings that the initial lockout was lawful, that is, it was not motivated by anti-union animus but rather by DNI's legitimate need to prevent quickie strikes. By July 1, DNI laid off the least-senior drivers because it had eliminated their jobs. Certainly, it expedited the elimination of these positions because of the strike, but it had long since planned to lay off these drivers as the transition to the new facility progressed.

The doctrine of entrepreneurial discretion holds that an employer may make significant changes in its operations "so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the National Labor Relations Act." *NLRB v. J.M. Lassing*, 284 F.2d 781, 783 (6th Cir. 1960); *see also Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831 (4th Cir. 2000) (finding no *Wright Line* violation where company's decision to move facility was motivated by anti-union animus but where company would have moved based on economic factors alone). This case does not present a situation in which, after the strike, DNI suddenly decided to find a way to cut back its runs for no reason other than to spite the Union. The reduction in runs had been in the works not only well before the strike but well before DNI had any inkling that the Union might call a strike. The move to the new facility was dictated by pure business judgment, not anti-union animus or a desire to chill participation in the Union. DNI should not be punished for doing what it had already planned to do, simply because it took that action more quickly in the aftermath of the strike.

For these reasons, we reverse the NLRB's finding that DNI committed unfair labor practices in its treatment of the thirteen least-senior drivers, and we refuse enforcement of the order on this issue.

### 2)      Stay-to-the-End Bonus

An employer violates NLRA § 8(a)(3) and (1) when it withholds an accrued benefit that employees would have received but for having exercised their § 7 right to strike. *Great Dane*, 388 U.S. at 32, 34-35. If the General Counsel has shown that the benefit was accrued and that it was withheld because of a strike, the employer may rebut the finding of an unfair labor practice by demonstrating that it had a legitimate and substantial business justification for withholding the benefit. *Texaco, Inc*., 285 N.L.R.B. 241, 245-46 (1987). A benefit is accrued when it is "'due and payable on the date on which the employer denied [it].'" *Conoco, Inc. v. NLRB*, 740 F.2d 811, 814 (10th Cir. 1984) (quoting *E.L. Wiegand Div., Emerson Elec. Co. v. NLRB*, 650 F.2d 463, 469 (3d Cir. 1981)).

Applying the *Texaco* test, the Board found that DNI owed the thirteen laid-off workers the Stay-to-the-End bonus. In response, DNI makes two arguments. First, it contends that the bonus was not an accrued benefit but rather a benefit dependent upon the performance of services, which can be withheld. Second, it argues in the alternative that even if the bonus were an accrued benefit, DNI acted on the good-faith belief that it was not, so the failure to pay does not rise to the level of an unfair labor practice. We disagree with both of DNI's theories.

Under the terms of the Stay-to-the-End offer, DNI promised to pay a bonus of up to $10,000 to employees who remained "actively at work, in good standing, until their release date." As the intent of the bonus was to reward work already done, we are not persuaded by DNI's assertion that the bonus was not an accrued benefit. The bonus accrued the day DNI terminated the drivers, no matter what that date was. It would not, of course, have accrued if the drivers terminated the employment relationship, because the purpose of the bonus was to keep soon-to-be laid-off workers on the job until *DNI* decided to release them.

As a preliminary matter, the Board found ample evidence that DNI would not have withheld the bonus just for missing one day of work, even if that were for a strike.[3] Accordingly, the "actively at work" language of the offer was not intended to require perfect attendance. Instead, DNI argues that the bonus was not withheld because of the strike but rather because the combination of the unannounced strike and the failure of the drivers to give work assurances after the strike meant that they were not "actively at work" during the six days from the end of the strike to their layoff. According to this reasoning, then, it was the drivers who did not live up to the terms of the bonus agreement; therefore, DNI had a legitimate and substantial business justification to refuse to pay the bonus.

We find two weaknesses in DNI's argument. First, the language of the offer only obligated the employees to stay until they were released, and that date was left entirely to DNI's discretion. We have found that DNI exercised that discretion when it locked the drivers out after the strike. Furthermore, in the immediate aftermath of the strike, DNI chose not to give the least-senior drivers the same opportunity to make work assurances and return to work that it had offered to the senior drivers. Therefore, we reject DNI's claim that it refused the bonus because the drivers would not give work assurances. In addition, after July 1, DNI pronounced the layoffs "unconditional," and told the drivers that "[a]ssurances regarding disruptions will have no effect on the layoffs." DNI cannot have it both ways, claiming that the strike alone did not prevent the drivers from remaining "actively at work" but then arguing, after preventing them from returning to work, that the drivers did not fulfill the requirements to stay at work.[4] Consequently, DNI has not persuaded us that it withheld the bonus for any reason except for the strike.

However, even if the bonus were an accrued benefit withheld because of a strike, DNI could rebut the finding of an unfair labor practice by showing that it withheld the benefit for a legitimate and substantial business reason. DNI's second argument is that it had a legitimate justification for refusing to pay the bonus because it did not get a *quid pro quo* for the bonus when the layoffs forced it to hire replacement workers, which is exactly what the bonus was designed to avoid. We find no merit in this argument. With the exception of the one-day strike, which DNI admitted was not enough to invalidate the bonus, the drivers did stay at work until DNI turned them away. The drivers made clear their willingness to return to work after the strike by showing up on June 27, but DNI locked them out and then did not offer them an opportunity to give the necessary work assurances that DNI required.

For the same reasons we also are not persuaded by DNI's contention that it acted in good faith in withholding the bonus and therefore did not commit an unfair labor practice. *Texaco*, 285

---

[3] As DNI's attorney explained to the NLRB, "DNI is not arguing that the strike disqualified any driver from receiving the bonus. Nor is DNI arguing that being off work for a few days disqualifies any driver from receiving the bonus." And again, "[O]ne night off to exercise a protected right is not a disqualifying criteria for earning the bonus."

[4] DNI argues that it cannot be faulted for locking the workers out because the Acting Regional Director found the lockout to be lawful. We fail to see how the lawfulness of the lockout plays any role in this matter. It was still DNI that decided to prevent the drivers from coming to work, and it was DNI that chose not to offer the thirteen least-senior drivers the same opportunity to give work assurances that it offered the eighteen senior drivers.

N.L.R.B. at 248 n.18 (holding that if employer refuses to pay benefit because it in good faith believes the benefit is not unconditionally accrued, its nonpayment does not constitute an unfair labor practice).  DNI argued that it believed in good faith that the drivers did not earn the bonus when they terminated the agreement by failing to stay actively at work.  But since it was DNI that prevented them from staying at work, we do not see how DNI can claim this good-faith belief.

Therefore, we affirm the NLRB's order and grant enforcement.

## V

As a final matter, DNI contends that the ALJ committed reversible error when he stated with regard to the decisions of the Acting Regional Director and the General Counsel not to file charges on certain of the Union's complaints, "You all understand that I'm bound by none of this.  The rulings of the Regional Director.  The rulings of the Office of Appeals are not binding on me."  DNI is correct that, as a general rule, the ALJ's statement misconstrued the law.  The NLRA gives the General Counsel virtually unreviewable rights to decide what charges should be pursued. § 3(d), 29 U.S.C. § 153(d); *NLRB v. United Foods and Commercial Workers Union*, *AFL-CIO*, 484 U.S. 112, 124-26 (1987) (discussing the dichotomy established by the NLRA between the General Counsel, with "final authority" for deciding what complaints to file, and the Board, with an adjudicative function); *New Otani Hotel and Gardens*, 325 N.L.R.B. 928, 946 (1998).  However, the General Counsel's "final authority" not to file a complaint on a particular charge does not bind the ALJ or NLRB in a separate but related case. *Bryant & Stratton Bus. Inst., Inc. v. NLRB*, 140 F.3d 169, 185 (2d Cir. 1998).

Of course, in deciding the "separate but related case" the ALJ cannot contradict the General Counsel's findings that some complained-of activity did not constitute an unfair labor practice.  "To hold otherwise would . . . create the undesirable situation of the Board's acting in practice as a forum for considering the content of charges which the General Counsel, for reasons satisfactory to himself, has thought it proper to dismiss."  *Times Square Stores, Corp.*, 79 N.L.R.B. 361, 365 (1948); *accord United Foods and Commercial Workers Union v. NLRB*, 675 F.2d 346, 351 (D.C. Cir. 1981); *Serv. Employees' Int'l Union (Children's Rehabilitation Center, Inc.)*, 211 N.L.R.B. 982, 982 (1974).  Where we believe that the Board might in this case have failed adequately to take into consideration some aspect of the General Counsel's findings, we have so stated.  Otherwise, the charges that were eventually filed against DNI constituted a "separate but related case," and the ALJ did not use dismissed charges to decide these related matters.

## VI

For the foregoing reasons, we **AFFIRM** the NLRB and grant enforcement of its order to reinstate the senior drivers locked out as of December 27, 1999, with back pay from that date; to cease and desist from coercion, threats, and direct dealing; to pay the Stay-to-the-End bonus with interest to the thirteen least-senior drivers; and to post the usual notices.  We **REVERSE** the NLRB and deny enforcement of the order to reinstate the thirteen least-senior drivers, and to pay them back pay.